[Crim. No. 5868. Fifth Dist. June 9, 1983.]

THE PEOPLE, Plaintiff and Respondent, v.
JAMES FLORES, Defendant and Appellant.

462

COUNSEL

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, and Eric J. Coffill, Deputy State Public Defender, for Defendant and Appellant.

George Deukmejian and John K. Van de Kamp, Attorneys General, Robert H. Philibosian, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Eddie T. Keller and Maria J. Fonseca, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

MARTIN, J.—Appellant appeals from his conviction of second degree murder (Pen. Code, § 187).

On May 10, 1981, Richard Corchado, Frank Lopez, and appellant spent the majority of the day drinking beer. Around 8 p.m. that evening they drove in appellant's car to the Midway Cafe in Dos Palos, California. The three drank beer and played pool for about three hours.

An older man, later identified as Barnardo Cardoza, was in the bar wearing a pink shirt and a white hat. He was pretty high, acting a little drunk, bothering people and attempting to buy sexual favors from the "lady folk." The owner of the bar, Jessie Robinson, asked a regular patron of the bar

(Tony) to take the man out of the place. Neither Robinson nor the bartender saw Cardoza leave.

Richard Corchado saw appellant talking with Cardoza. Sometime that evening appellant left the bar, followed by the gentleman. Appellant came back alone approximately one-half hour later.

Corchado, Lopez, and appellant remained at the bar for awhile. They left the bar and appellant took his companions home. Lopez was in the front seat and Corchado was in the back seat. Appellant was talking mostly with Lopez. Corchado testified that appellant stated he and the victim got into an argument, appellant beat the old man up and dumped him in the canal. Corchado asked appellant why he did it; appellant replied "Don't worry about it." According to Corchado, appellant seemed calm and there were no physical marks to indicate he had been in a fight.

The body of the victim was discovered in the canal on May 11, 1981. There were signs of violence on the body, facial bruises and lacerations. The son of the victim, Jesus Cardoza, identified the body. The cause of death was determined to be drowning.[1] The pathologist testified it was his opinion that the lacerations and bruises were caused by a heavy blunt instrument. The deceased had a blood alcohol content of .23.

On May 28, 1981, appellant was interviewed by Detectives Dutro and Pierce at the Merced County Sheriff's office. Appellant was under arrest at that time. Appellant was given his *Miranda* warnings and made a statement. According to Dutro, no promises or threats were made. The tape of the interview was entered into evidence. It was stipulated that the court had heard it.[2] Appellant's statement was that when he stepped outside of the cafe, the old man hit him in the jaw. Appellant told him if he wanted to fight they would drive into the countryside. They drove to the canal in appellant's car. On the way, the victim kept telling appellant he was going to kill him and swung at him a number of times. At the canal, the victim pulled a knife, they fought, and the old man fell into the canal. Appellant saw the man floating; he tried to get him out of the water. The victim was gurgling; appellant panicked and left.

In his defense, appellant called Officer Dutro to the stand. Dutro testified that during the course of his investigation he spoke with Jesus Cardoza, the

---

[1] It was stipulated at trial that the pathologist's preliminary hearing testimony could be used.

[2] The morning of trial, the tape was played in appellant's Evidence Code section 402 hearing. The same judge presided at appellant's trial.

son of the victim. Jesus Cardoza had told Dutro that the victim would at times become obnoxious and violent when he drank.

Frank Lopez also took the stand in appellant's defense. He testified that he, Corchado, and appellant had been drinking all day and were drunk. Appellant had only left the bar for 10 minutes. Lopez denied any conversation regarding the victim in the car on the way home.

*Evidence Code section 402 hearing.*

The morning of trial, the hearing on appellant's Evidence Code section 402 hearing was held. Officer Pierce testified to the interview with appellant. The tape was played. After argument, appellant's motion to suppress was denied.

## DISCUSSION

Appellant contends the admission of his statement into evidence at trial constituted reversible error because the statement was not freely and voluntarily given. He argues his will was overborne and the statement was not "the product of a rational intellect and a free will." Appellant characterizes his statement as a confession and argues its admission constitutes per se reversible error. Respondent contends otherwise.

At the beginning of the interview appellant was given his *Miranda* warnings and effectively waived them. He described his activities on that day, including the admission he had gone to the Midway Cafe that evening. He denied leaving the cafe except for going to his car and picking up some beer. He did not remember seeing an old man in the bar.

The officers thereupon accused him of leaving the cafe for 30 minutes. They informed appellant they would not have arrested him if they did not have tangible information. The officers told appellant "accidents happen" and that there were "two sides to every story." The officers suggested the victim could have precipitated a fight and told appellant it was time for him to give his side of the story.[3] Appellant thereupon stated he had given the old man a ride to the housing project down the road and had immediately returned to the cafe. Appellant denied taking the victim to the canal but stated he had heard of a person being killed.

The intensity of the interrogation increased:

---

[3]The officers referred to the victim as "an ornery old fucker," "an ornery old fart," "an ornery old man," "a turd" and "an asshole."

"D: Are you telling me the truth?

"F: Yeah, I'm telling you the truth.

"D: OK, let me ask you this. Like I said, we wouldn't have you here, we wouldn't have arrested you on a warrant if we didn't have some information, right? We didn't know a little more than you think probably we know. But here's the situation now, as I say, we're talking to you now to get your side of the story. You see, the way, the way it looks is that old man was taken out and he was robbed and he was killed. That's the way it looks now, OK, now that's what I say now, there's two sides to this story, you know, and

"F: Well, I don't know nothing about him being robbed or anything like that, as far as I'm concerned. I just gave him a ride. Thats it."[4]

The officer stated the victim had been seen in appellant's car and that robbery and murder were pretty serious offenses:

"D: No, you're not, we're not asking you to take anybody's rap for them. We're asking you now to tell us the story and we know he was with you out by those canals.

"F: I already told you. No, he wasn't. He wasn't with me. I'll tell you right now.

"D: He was out there with you, Jaime, and he was killed out there.

"F: Not by me, he wasn't.

"D: You can sit all day and tell me no, no, no, no, no (muffled) that's the way it uh, it is, you know.

"F: Listen to what you're just saying, (muffled)

"D: As I say, robbery and homicide are pretty serious offenses, you know, maybe it, maybe something happened, you know, that it could be self-defense. You never know, you know, that's what I said. We need to talk, get your side of the story, you know, we knew he was a nasty old man and everybody we talked to said, hey, when he's drunk, he's an ornery old man, even his, his whole family says that, you know, there's a lot of dif-

---

[4]"D" is Detective Dutro, "P" is Detective Pierce, and "F" is appellant.

ference between self-defense and murder. The story we've got right now and the information we're looking at right now is murder.

"F: Not me it ain't."

The possibility of self-defense was raised with the officer noting the old man was drunk and appellant could have got into a "beef" with him.

"P: Like we said, Jaime, we know that you were in that area with the old man in the car, we know that. Like he said, we have no reason to lie to you and we know that you may have had a reason, you know, like he says, the old man was an asshole. There ain't no doubt about it; we talked to everybody out there and said he was an asshole when he's drinking and you may have had a reason, and we know you were out there with him on the canal (inaudible) And you can sit here all day and tell us that no, but we know that. We're trying to get, you know, your side of the story, you know, what happened. We got one side of the story and we're trying to get your side now. Like I said, the old man's an asshole like he said he was and you know, you may have got in an argument with him. We don't know that and that's what we're trying to find out.

"F: You got my story already."

At this point, the possible penalty was raised:

"D: And uh, this is a serious situation. Right now the way it looks, it looks like robbery and murder. You know what robbery and murder is? Robbery and murder is a capital offense in California. An offense that you could, you could get the, you know, *you could go to the, to the gas chamber or the electric chair whatever.*" (Italics added.)

Again, the officer repeated the possibility of a fight and self-defense, that there were two sides to every story and that appellant was the only person who could help himself.

After some further conversation about a polygraph test appellant began to break, stating that with his record of assaults he would "still be dead anyway." The officers pointed out a county jail record was nothing to worry about; it was "joint" time that was important.

"P: You say if you tell it you're dead anyway. Well, that's not true. What you tell us may help you in the long run. I don't know. Only you can tell us that, when we decide that. Well, you want to tell us what happened out there?

"F: Let me think back, if I let you know, what, what came down, do you think get O.R.ed until I go, until I go to court?

"P: I don't have any idea. I'd have to know what you've got to tell me. I can't tell you anything until I know what happened.

"F: This is being taped, ain't it? Being taped?"

Again the officers repeated there were two sides to every story. After a pause, appellant gave his story (as noted above). At the close of the interrogation, appellant stated everything he said was free and voluntary:

"D: Okay, and everything you've told us today has been true, and everything has been free and voluntary, we've made no promises to you.

"F: No you haven't twisted my arms or nothing.

"D: And we've made no promises to you.

"F: No I estimated I'll get ORd and I won't take off or nothing.

"D: Let me give it to you this way, okay, we don't know anything, you know what they can do, when you go to court, thats the time you can ask for that. We can't promise you to get you ORd, . . .

"F: Just going to be a Judge . . .

"D: I don't know it will go into Municipal Court and then Superior Court and thats up to the Judges, we can't tell you yet, if I was to tell you yes or Kenny was to tell you yeah we'll give you OR, we can't do that, you know we can't make you any promises. Everything you have told us we will relate to him in report form and we have it on. . . ."

Appellant contends the interrogation in the instant case was impermissibly coercive, fraught with implied promises and therefore his statement was not the product of a rational intellect and free will.

██ " '[A] defendant in a criminal case is deprived of due process of law if his conviction is founded, in whole or in part, upon an involuntary confession, without regard for the truth or falsity of the confession . . . [citation omitted] and even though there is ample evidence aside from the confession to support the conviction.' *Jackson* v. *Denno,* 378 U.S. 368, 376, . . . (1964). The reasons for excluding a coerced confession were explained fully by the Court in *Jackson.* First, confessions obtained in a coercive manner

are likely to be unreliable. More important, involuntary confessions are forbidden 'because of the "strongly felt attitude of our society that important human values are sacrificed where an agency of the government, in the course of securing a conviction, wrings a confession out of an accused against his will," [citation] and because of "the deep-rooted feeling that the police must obey the law while enforcing the law; that in the end life and liberty can be as much endangered from illegal methods used to convict those thought to be criminals as from the actual criminals themselves." ' *Spano* v. *New York,* 360 U.S. 315, 320-21 . . . *Jackson,* 378 U.S. at 386, . . .

■ "In order to be voluntary, a confession must be 'the product of a rational intellect and a free will.' [Citation.] The Fifth Amendment secures 'the right of a person to remain silent unless he chooses to speak in the unfettered exercise of his own will, and to suffer no penalty . . . for such silence.' *Malloy* v. *Hogan* 378 U.S. 1, 8, . . . (1964). Consequently, a confession 'must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, *nor by the exertion of any improper influence.*' [Citations.]

"A confession is involuntary whether coerced by physical intimidation or psychological pressure. [Citation.] Law enforcement conduct which renders a confession involuntary does not consist only of express threats so direct as to bludgeon a defendant into failure of the will. *Subtle psychological coercion suffices as well, and at times more effectively, to overbear 'a rational intellect and a free will.'* As the Supreme Court noted in *Malloy,* '[w]e have held inadmissible even a confession secured by so mild a whip as the refusal, under certain circumstances, to allow a suspect to call his wife until he confessed.' [Citations.]" (*United States* v. *Tingle* (9th Cir. 1981) 658 F.2d 1332, 1334-1335, italics added.)

■ "Confessions obtained by coercive practices which overcome the will of the person confessing are tainted, and both the confession and its products will be suppressed." (*People* v. *Andersen* (1980) 101 Cal.App.3d 563, 574 [161 Cal.Rptr. 707].) The cases require a rigorous standard of review. ■ This court must " ' ' "examine the uncontradicted facts to determine independently whether the trial court's conclusion of voluntariness was properly found." ' " ' (*People* v. *Jimenez* (1978) 21 Cal.3d 595, 609 [147 Cal.Rptr. 172, 580 P.2d 672]; see also *People* v. *Murtishaw* (1981) 29 Cal.3d 733, 753 [175 Cal.Rptr. 738, 631 P.2d 446].) Where the evidence consists of a transcription of the interrogation, the evidence is not in conflict and the appellate court can freely exercise its review of the record. (*People* v. *McClary* (1977) 20 Cal.3d 218, 227 [142 Cal.Rptr. 163, 571 P.2d 620].)

In determining the question of the voluntariness of appellant's statements, this court is required to consider the *entire* record below. (*Davis* v. *North Carolina* (1966) 384 U.S. 737, 741-742 [16 L.Ed.2d 895, 898, 86 S.Ct. 1761]; *People* v. *Stroud* (1969) 273 Cal.App.2d 670, 674, 682 [78 Cal.Rptr. 270].) We must examine "all the surrounding circumstances— both the characteristics of the accused and the details of the interrogation." (*Schneckloth* v. *Bustamonte* (1973) 412 U.S. 218, 226 [36 L.Ed.2d 854, 862, 93 S.Ct. 2041], quoted in *People* v. *Hogan* (1982) 31 Cal.3d 815, 841 [183 Cal.Rptr. 817, 647 P.2d 93].)

■ The relevant principles regarding implied promises of leniency or benefits are stated in *People* v. *Hill* (1967) 66 Cal.2d 536, 549 [58 Cal.Rptr. 340, 426 P.2d 908]: "The line to be drawn between permissible police conduct and conduct deemed to induce or tend to induce an involuntary statement does not depend upon the bare language of inducement but rather upon the nature of the benefit to be derived by a defendant if he speaks the truth, as represented by the police. Thus, 'advice or exhortation by a police officer to an accused to "tell the truth" or that "it would be better to tell the truth" *unaccompanied by either a threat or a promise,* does not render a subsequent confession involuntary.' [Citation.] . . .

"When the benefit pointed out by the police to a suspect is merely that which flows naturally from a truthful and honest course of conduct, we can perceive nothing improper in such police activity. On the other hand, if in addition to the foregoing benefit, or in the place thereof, *the defendant is given to understand that he might reasonably expect benefits in the nature of more lenient treatment at the hands of the police, prosecution or court in consideration of making a statement, even a truthful one, such motivation is deemed to render the statement involuntary and inadmissible.* The offer or promise of such benefit need not be expressed, but may be implied from equivocal language not otherwise made clear." (Italics added.)

■ It is clear from *People* v. *Hill, supra,* 66 Cal.2d 536 the mere exhortation to tell the truth or comment that the accused would "feel better" or would be "helping himself by cooperating" is not in itself sufficient to establish improper inducement. (*People* v. *Jackson* (1980) 28 Cal.3d 264, 299-300 [168 Cal.Rptr. 603]; *People* v. *Ditson* (1962) 57 Cal.2d 415, 433 [20 Cal.Rptr. 165, 369 P.2d 714].) Moreover, truthful and "commonplace" statements of possible legal consequences, if unaccompanied by threat or promise, are permissible police practices and will not alone render a subsequent statement involuntary and inadmissible. (*People* v. *Andersen, supra,* 101 Cal.App.3d 563, 579.)

However, the accused's statement must be entirely self motivated: "If the pressure or inducement was 'a motivating cause' of the decision to confess,

the confession is involuntary and inadmissible as a matter of law." (*People* v. *Thompson* (1980) 27 Cal.3d 303, 328 [165 Cal.Rptr. 289, 611 P.2d 883].)

Respondent argues the statements made by the officers were merely exhortations to tell the truth and the references to the death penalty and to the victim as an "ornery old fart" were merely a legitimate summary of the situation. Furthermore, respondent argues no implied promises were made with respect to the officers' references to appellant's record and his inquiry to "OR."

We disagree. The detectives went further than giving mere exhortation and advice to tell the truth. ■ As was explained in *People* v. *Nicholas* (1980) 112 Cal.App.3d 249, 264-265 [169 Cal.Rptr. 497]: "Once a suspect has been properly advised of his rights, he may be questioned freely so long as the questioner does not threaten harm or falsely promise benefits. Questioning may include exchanges of information, summaries of evidence, outline of theories of events, confrontation with contradictory facts, even debate between police and suspect. As noted by Friedman, J., good faith confrontation is an interrogation technique possessing no apparent constitutional vice. (*People* v. *Lantz* (1968) 265 Cal.App.2d 5, 8 . . . .) Yet in carrying out their interrogations *the police must avoid threats of punishment for the suspect's failure to admit or confess particular facts and must avoid false promises of leniency as a reward for admission or confession.* It is apparent that when the police interview a suspect, they must skate a fine line. They are employed to protect the public, to solve crimes, to discover missing persons, and to determine whether missing persons have been victims of foul play. They are authorized to interview suspects who have been advised of their rights, *but they must conduct the interview without the undue pressure that amounts to coercion and without the dishonesty and trickery that amounts to false promise.*" (Italics added.)

■ Applying the foregoing rules to these facts, the totality of the circumstances of appellant's interrogation reveals impermissible abuse.

The interrogation of appellant by Detectives Pierce and Dutro lasted more than an hour with occasional pauses and interruption of the questioning. During the first portion of the interrogation, 30 to 40 minutes more or less, up to the point in time when Detective Dutro threatened the death penalty if appellant did not tell them what he knew, it cannot be said that the officers exerted undue pressure that amounted to coercion or indulged in dishonest or deceitful conduct that amounted to false promise.

However, the entire atmosphere of the interrogation changed from that point onward. The statement that the appellant could be subject to the pos-

sibility of the death penalty if he were found guilty of murder and robbery was factually correct. However, this was immediately followed by Dutro's statement "Maybe that's not so, you know, but you're the only one that knows that." Implicit in this remark is the inference, "the carrot," that appellant would be treated differently, more leniently as a reward for his admission or confession.

Threats, express or implied, of heavy punishment accompanied by promises or suggestions of leniency or other advantage if a confession is given, render a statement inadmissible. In the present case, the appellant was explicitly told ". . . we need you to help yourself out of this mess." Only by confessing his involvement in the decedent's death could the appellant avoid the possible death penalty.

The defendant's reply that "You got to die sooner or later," does not lessen the impact of the threat and attending promise. A similar reply was made by the defendant in *People* v. *Nicholas, supra,* 112 Cal.App.3d 249 where after the officers advised the defendant that the death penalty " '*went back in today,*' " the defendant responded, " 'If I am guilty, which I feel I am not, then a life for a life.' " (*Id.,* at p. 265.) The court held the death penalty threat rendered the confession involuntary. (*Id.,* at pp. 266-267.)

Appellant suggests the instant case is much like *People* v. *Johnson* (1969) 70 Cal.2d 469 [74 Cal.Rptr. 889, 450 P.2d 265]. In that case, the officers informed the suspect (a minor) that he had been accused of first degree murder and that he might go to the gas chamber. The suspect was exhorted to tell the truth because no one would believe his denial of complicity. Although the case may be factually distinguishable (pre-*Miranda,* no warnings before the interrogation, the minority of the defendant), the principle is applicable: "This appears to be more than merely pointing out to a suspect that which flows naturally from a truthful and honest course of conduct. It carries the implication that by cooperating and telling what actually happened he might not be accused of or found guilty of first degree murder (i.e. more lenient treatment by the court or jury). To someone unskilled and uncounseled in the law it might have offered a hope . . . that he might be cleared of any serious charges. . . . It stretches the imagination to believe that he knowingly and intelligently waived his right to be free from self-incrimination." (*Id.,* at p. 479.)

Exacerbating the situation, in response to appellant's question whether he would get "ORd" if he made a statement, the officer stated "I don't have any idea. I'd have to know what you've got to tell me. I can't tell you anything until I know what happened." Implicit in this answer is a promise

that if appellant can give a story supporting self-defense, he might stand a chance of being free until trial.

After almost an hour of interrogation and repeated denials by appellant of any complicity or culpability in the victim's death, after the threat of a possible death penalty, after assurance that his prior record of assaultive conduct was "nothing to worry about" and after the implied promise that he might be released from custody until trial, appellant broke and gave the inculpative version of the events that night.

Under all the circumstances, we conclude appellant's incriminating admissions were not a product of free intellect and rational choice. The police officers carried on a course of conduct designed at breaking down appellant's will. The combined implied threats and promises, as noted above, were the motivating inducing cause of appellant's statement.

The question of prejudice remains. Appellant contends the admission of the statement is per se reversible. ■ The law is that the improper introduction of a confession is per se reversible whereas an admission is subject to the test in Chapman v. California (1967) 386 U.S. 18, 23-24 [17 L.Ed.2d 705, 710, 87 S.Ct. 824, 24 A.L.R.3d 1065]. (*People* v. *McClary* (1977) 20 Cal.3d 218, 230 [142 Cal.Rptr. 163, 571 P.2d 620].) ■ The statement by defendant shows indicia of self-defense, thus the record shows the statement to be more of an admission than confession. Under *Chapman,* it cannot be said beyond a reasonable doubt that the admission of appellant's statement did not contribute to the verdict. The only other evidence at trial that directly tied appellant to the murder was his alleged statement made to Lopez. This was denied by Lopez. The error was prejudicial.

The judgment is reversed. Upon retrial, that portion of appellant's statement commencing with Detective Dutro's reference to a capital offense (the last question at the bottom of page 15 of the transcribed statement) and all that follows may not be used against him.

Franson, Acting P. J., and Hanson (P. D.), J., concurred.