THE STATE OF OHIO, APPELLANT, *v.* ARRINGTON, APPELLEE.

(No. E-83-36—Decided February 3, 1984.)

Mr. John A. Pfefferle, prosecuting attorney, for appellant.

Mr. James W. Hart, for appellee.

HANDWORK, J. This case is before the court on appeal from a judgment of the Erie County Court of Common Pleas.

The essential facts may be summarized as follows. On September 14, 1983, the trial court granted defendant-appellee's motion to suppress certain statements he made to Sandusky police detectives during his interrogation. The detectives had questioned appellee, Raymond Arrington, on June 10, 1983, about the circumstances of a shooting involving appellee and another suspect, James Cherry. The interrogation session was tape-recorded.

The shooting being investigated had occurred earlier on May 26, 1983. An elderly man, returning home, discovered Cherry and appellee either inside a screened-in portion of his house or on the back porch, just outside it. Upon being discovered, appellee fled; Cherry began to run, but then turned, pulled a handgun and shot the man.

Based upon these events and the detectives' investigation, an Erie County Grand Jury returned indictments against Cherry and appellee. Although concerned only with appellee's case, we note that Cherry (who was the triggerman) eventually pled guilty to attempted aggravated murder, largely because appellee would have testified against him at trial. However, at the

time his indictment was returned, appellee was therein charged on three counts: (1) attempted aggravated murder, with a specification that he committed this offense while having a firearm on or about his person or under his control (see R.C. 2941.141); (2) aggravated burglary, with the same specification; and (3) felonious assault.

Appellee's amended motion to suppress was filed on August 22, 1983. A hearing thereon was held on September 1. The trial court ordered appellee's statement suppressed, stating that:

"[T]he defendant was improperly influenced to give his statement because of promises of immunity from prosecution on certain charges [and because] the police officers misstated the law regarding the possible ultimate disposition of charges then pending and this representation motivated the defendant to make his statement."

From the court's suppression order, the state has brought this appeal under Crim. R. 12(J). The state's sole assignment of error is as follows:

"The trial judge erred to the prejudice of the appellant by ruling the confession of the defendant was not voluntary in that the trial judge failed to apply the 'preponderance of evidence' standard in considering the 'totality of the circumstances.' "

Normally, in order to determine the voluntariness issue when there is conflicting evidence, an independent review of the record is warranted. See *Mincey* v. *Arizona* (1978), 437 U.S. 385, 398; cf. *Beckwith* v. *United States* (1976), 425

U.S. 341, 348. Here, however, there exists a complete transcript of appellee's interrogation on June 10, which was proffered at the suppression hearing as state's Exhibit 1. A review of that transcript reveals that Detectives Curt Muehling and Roy Prewitt conducted the interrogation. After reading appellee the *Miranda* warnings, but before obtaining a waiver of those rights, Muehling asked:

"[Do] you want to go ahead and start telling me what happened on uh, this particular?"

Appellee then asked:

"Is he bringing a waiver thing back?"

Muehling replied:

"Yeah, he's bringing a waiver-of-your rights back. He'll be back shortly."

Appellee then stated:

"Man * * * I didn't shoot this guy man, just forgot it.

"Q. [Muehling:] Well tell us what happened Ray. *I told you we got six charges for you.* Okay, this on the tape. *Um, I said I would dismiss the grand theft on the firearms. And I got an aggravated robbery and an attempted aggravated burglary to serve on you yet. I won't serve them * * * they won't ever be served on you if you cooperate * * * for the sake of the tape. Okay?* Okay, here's a copy of your constitutional rights. Can you read Ray?

"A. Yeah." (Emphasis added.)

After receiving additional *Miranda* warnings, appellee then read a waiver form.[1] The interrogation then continued, with Prewitt asking:

---

[1] Since the only issue presently before us is the voluntariness of appellee's statements, we do not address or decide whether his statements were obtained in violation of the "knowing and intelligent" waiver rule regarding a valid waiver of one's *Miranda* rights. The two issues — the voluntariness of a confession and compliance with *Miranda*'s strictures — are analytically separate in-

quiries. See *State* v. *Chase* (1978), 55 Ohio St. 2d 237, 246-248 [9 O.O.3d 180]; *State* v. *Kassow* (1971), 28 Ohio St. 2d 141, 143-145 [57 O.O.2d 390].

We do note, however, that although the transcript appears to indicate that appellee *may* have waived his *Miranda* rights, he did not do so until *after* Prewitt made certain representations to him, to which appellee

"Okay, do you understand what your rights are Ray? Do you understand that paragraph you just read?

"A. *Not about* * * * *not about some of it.*

"[Prewitt:] Okay, what * * * that paragraph means is that you're willing to give us a statement, you're willing to waive these rights. However, during the questioning if at any point you do not want to answer a question you don't have to, or if you request an attorney during the statement then that's fine. Do you understand what I'm saying?

"A. Yeah." (Emphasis added.)

In the course of explaining the waiver, Prewitt did not tell appellee that anything he said to the detectives would be used against him in a subsequent prosecution. Nonetheless, after signing the waiver form, appellee stated:

"Man, I still can't go no where for aggravated murder, man.

"[Muehling:] *It's attempt. And like I explained to you before, if you weren't the one who pulled the trigger* * * * *it can be probational* * * * *if you are the one who pulled the trigger you got three years' mandatory.*

"[Appellee:] Okay * * * okay, right. Well, this still on me right here.

"[Muehling:] Uh, hmm.

"[Appellee:] *That won't be tooken* [sic] *off?*

"[Muehling:] Well, that's * * * *it may be down the line, okay?* That's for your attorney to dicker with the prosecutor on.
"* * *

"[Muehling:] Tell me what happened." (Emphasis added.)

Appellee then proceeded to implicate Cherry in the shooting and incriminate himself. Appellee disclosed that on the night of the shooting, he had carried on his person a handgun belonging to Cherry, but claimed he eventually returned it to Cherry before the victim was shot. At this point in the interrogation, Prewitt stated:

"Remember, Ray, this has to be a truthful statement.

"A. I understand.

"Q. You can talk to us * * * *you don't have to worry about no additional charges.*
"* * *

"[Muehling:] Right. *You're just facing these charges.*
"* * *

"[Muehling:] So we got to have a truthful statement. On down the line possibly you could uh, be requested to take a polygraph to back up what you say. *And if what you say is not true, then you* [sic] *not going to get the cooperation out of the prosecutor on plea bargaining, right?* Do you understand what I'm telling ya?

"A. Yeah.
"* * *

"Q. Okay, now let me explain to you again, Ray, that, like I said, you'll probably be required to take a polygraph on down the line. *Okay, now if you're completely truthful with us you gonna probably get some plea bargaining down on your charges. If you didn't do the shooting* that's one other question uh, I

---

responded. Also, the record discloses that the prosecution could not produce at the suppression hearing the written waiver form that appellee allegedly signed, the apparent reason being that it had been "lost." Thus, arguably, the prosecution might have failed to meet its "heavy burden" of showing that appellee intelligently waived his right to counsel and his right to remain silent. See *Miranda* v.

*Arizona* (1966), 384 U.S. 436, 444, 470, 475 [36 O.O.2d 237]. In any event, the fact that appellee was informed of his *Miranda* rights prior to making his incriminating statements does not cure the improper inducement which led to them, and the prosecution has not presented us with citations of authority that hold otherwise.

think you went up on the porch. Because we got information that you went up on the porch. *And it don't make any difference* * *.

"* * *

"Q. Okay, now that will be another point of contention if * * * you know if you take a polygraph. Whether you went up there and was helping him get the meat out of the freezer. *It don't make any difference according to the charge, now Ray, but it's going to make a difference on down the line if you're telling the truth or not.* So you got to tell the truth here and now, okay? You weren't on the porch right?

"A. I was up on the porch * * *.

"* * *

"[Appellee:] Don't you all try to stick me, man. I'm serious man. Don't be lying to me that's all I'm asking. I'm telling the truth, man, but don't be lying to me.

"Q. Okay. Don't lie to me, Ray, and I won't lie to you. Okay?

"* * *

"Q. Okay, let me ask you about a few other things. *Things you won't be charged with if you admit them. Okay?*" (Emphasis added.)

In support of its assignment of error, the prosecution argues that the trial court failed to apply the correct standard of proof in determining whether appellee's statements were voluntarily made. Once the admissibility of a confession is challenged, the prosecution must prove voluntariness by a preponderance of the evidence. See *Lego* v. *Twomey* (1972), 404 U.S. 477, 489; *State* v. *Melchior* (1978), 56 Ohio St. 2d 15, 25 [10 O.O.3d 8]. While such a standard entails an assessment of the evidence in terms of greater and lesser weight, the burden nevertheless rests with the prosecution to establish that the confession was voluntary. More to the point, since the prosecution, in this case, offered in evidence the transcript of the tape-recorded interrogation, and since *that*

was the basis upon which the trial court ultimately decided to suppress appellee's statement, there was little need for the court to have "weighed" the detectives' testimony at the suppression hearing.

Because the inquiry focuses upon whether the accused's statements were made voluntarily, the test for voluntariness is whether, in light of the totality of the circumstances, the police obtained the incriminating statements by coercion or improper inducement. *Haynes* v. *Washington* (1963), 373 U.S. 503, 513-514; cf. *State* v. *Chase* (1978), 55 Ohio St. 2d 237, 246-248 [9 O.O.3d 180]. In this latter context involving improper promises or inducements, the constitutional principle has been stated thusly:

"In order to be voluntary, a confession must be 'the product of a rational intellect and a free will.' * * * The fifth amendment secures 'the right of a person to remain silent unless he chooses to speak in the unfettered exercise of his own will, and to suffer no penalty * * * for such silence.' *Malloy* v. *Hogan,* 378 U.S. 1, 8 * * *. Consequently, a confession 'must not be extracted by any sort of threats or violence, *nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence.'*

"* * *

"A confession is involuntary whether coerced by physical intimidation or psychological pressure. * * * Law enforcement conduct which renders a confession involuntary does not consist only of express threats so direct as to bludgeon a defendant into failure of the will. Subtle psychological coercion suffices as well, and at times more effectively, to overbear 'a rational intellect and a free will.' " *United States* v. *Tingle* (C.A. 9, 1981), 658 F. 2d 1332, 1335-1336.

As persuasively stated in *People* v.

*Flores* (1983), 144 Cal. App. 3d 459, 192 Cal. Rptr. 772, 776-777:

" 'The line to be drawn between permissible police conduct and conduct deemed to induce or tend to induce an involuntary statement does not depend upon the bare language of inducement but rather upon *the nature of the benefit to be derived by a defendant if he speaks the truth,* as represented by the police. * * *

" 'When the benefit pointed out by the police to a suspect is merely that which flows naturally from a truthful and honest course of conduct, we can perceive nothing improper in such police activity. On the other hand, if in addition to the foregoing benefit, or in the place thereof, *the defendant is given to understand that he might reasonably expect benefits in the nature of more lenient treatment at the hands of the police, prosecution or court in consideration of making a statement, even a truthful one, such motivation is deemed to render the statement involuntary and inadmissible.* The offer or promise of such benefit need not be expressed, but may be implied from equivocal language not otherwise made clear.' (Emphasis added.)" (Quoting *People v. Hill* [1967], 66 Cal. 2d 536, 549, 58 Cal. Rptr. 340, 426 P. 2d 908.)

Here, the transcript (the accuracy of which is undisputed) explicitly reveals that the detectives' representations about the law, their suggestions of the possibility of probation and their unqualified language of leniency and benefit, produced appellee's incriminating statements. For example, the promise (whether characterized as express or implied) that some of the charges against appellee would be dropped while others would never be brought, induced him to disclose his involvement with Cherry on the night of the shooting. This artifice was clearly improper. See *Henthorne v. State* (Fla. App. 1982), 409 So. 2d 1081 ("Where the confession is produced by the promise of a benefit, however slight, the confession cannot stand."); *State v. Erks* (1983), 214 Neb. 302, 333 N.W. 2d 776; cf. *People v. Jones* (1982), 416 Mich. 354, 331 N.W. 2d 406.

The officers procured further incriminating statements through their erroneous representations about the law. From the context of the transcript, it is clear that appellee, in reliance on those representations, acquiesced to Muehling's exhortations to "tell the truth." Standing alone, of course, an officer's mere suggestion or statement that it would be better than not if the accused told the truth, is not improper. Nor is it improper for an interrogator to inform the suspect, accurately and noncoercively, of the maximum penalties for the offenses of which he is suspected. See, e.g., *United States v. Ballard* (C.A. 5, 1978), 586 F. 2d 1060, 1063; see, also, *United States v. Vera* (C.A. 11, 1983), 701 F. 2d 1349, 1364.

However, substantially more than simple exhortation, and something less than accurate legal advice, was involved here. Of particular significance is Detective Muehling's statement to appellee that "if you weren't the one who pulled the trigger * * * it can be probational." The facts then known to the officers were that appellee and Cherry had been seen earlier in the evening carrying guns. While Cherry may have been the actual triggerman, the indictment charged appellee with two aggravated felonies, followed by specifications that he "[had] a firearm *on or about his person or under his control*" while committing the stated offenses. Thus, appellee's conviction on either offense would entail a mandatory minimum of three years, under R.C. 2929.71 (and possibly six years if convicted of both), to be served prior to any other sentence he might receive on the underlying offenses. In addition, none of the offenses for which he was indicted were probational. See R.C. 2951.02(F)(1). Thus, not

only did certain of the officers' statements constitute "direct or indirect promises" of leniency or benefit, but other representations regarding the possibility of probation were misstatements of the law. It is not the police officer's prerogative to guarantee to an accused what charges, if any, will or will not be brought or which, if any, will be dismissed. Nor is it part of his job to "promise," or to give a suspect reason to believe that the officer is promising, probation upon conviction. Indeed, in an analogous context, we have recently disapproved of police promises of immunity from prosecution made to suspects in return for their "cooperation." See *State* v. *Tammerino* (Aug. 26, 1983), Lucas App. No. L-82-345, unreported. ("Once immunity has been discussed, there is a substantial risk that subsequent statements made by defendant are involuntary and made in reliance upon the promise of immunity. * * * Where the record discloses a promise of immunity and suggests that the defendant made statements, relying upon said promises, these statements will be considered involuntary, absent evidence tending to show that the defendant knew the promises of immunity had been withdrawn or knew that he had not fulfilled his part of the bargain such that reliance upon the promise of immunity would be unreasonable. * * * Appellant's statements were not freely and voluntarily made and should have been excluded at trial.") (Citation omitted.) *Id.* at 4-5.

Considering all the relevant factors, see *State* v. *Edwards* (1976), 49 Ohio St. 2d 31, and since the officers' statements and representations were the motivating cause of appellee's decision to speak, his incriminating statements, not being freely self-determined, were improperly induced, were involuntary and were inadmissible as a matter of law. See *United States* v. *Tingle, supra; People* v. *Flores, supra; Henthorne* v.

*State, supra;* cf. *Hutto* v. *Ross* (1976), 429 U.S. 28, 30; cf., also, *Townsend* v. *Sain* (1963), 372 U.S. 293, 308. Consequently, the trial court did not err in suppressing appellee's statements to the Sandusky police detectives, made during his interrogation on June 10, 1983.

Accordingly, the state's sole assignment of error is not well-taken.

On consideration whereof, the judgment of the Erie County Court of Common Pleas is hereby affirmed.

*Judgment affirmed.*

CONNORS, P.J., concurs.

DOUGLAS, J., dissents.