DECISION AND JUDGMENT ENTRY {¶ 1} This is an appeal from a judgment of conviction and sentence entered by the Lucas County Court of Common Pleas after defendant-appellant, Cecil Koger, was found guilty of aggravated murder with a gun specification and aggravated robbery with a gun specification. Koger now challenges that judgment through the following assignments of error: *Page 2 
 {¶ 2} "Assignment of Error Number One
 {¶ 3} "The trial court erred to the prejudice of Mr. Koger by failing to instruct the jury as to the lesser included offense of involuntary manslaughter in the commission of a misdemeanor.
 {¶ 4} "Assignment of Error and Issue Number Two
 {¶ 5} "The trial court erred in denying Mr. Koger's motion to dismiss pursuant to Rule 29 [sic] presented at the conclusion of the state's case in chief.
 {¶ 6} "Assignment of Error and Issue Number Three
 {¶ 7} "The trial court erred to the prejudice of Mr. Koger by denying his motion to suppress statements made to law enforcement officers in violation of his Fifth, Sixth and Fourteenth Amendments [sic] to the United States Constitution and the applicable portions of the Ohio Constitution."
 {¶ 8} On December 11, 1998, Koger was indicted and charged with the aggravated murder of Steven Johns. Attached to that charge were a firearm specification and the specifications that the offense was committed while Koger was committing aggravated robbery and that Koger was the principal offender in the commission of the aggravated murder. The second count of the indictment charged Koger with aggravated robbery. Attached to that count was a second firearm specification. Because Koger was 16 years old at the time of the offenses, he was not eligible to receive the death penalty.
 {¶ 9} The indictment was filed as a result of the events that took place in Toledo, Ohio on the evening of November 28, 1998. Appellant, along with his half brother, *Page 3 
Shamus Groom, and two acquaintances arrived at Johns' home at 3544 Elm Street with the expressed intention of purchasing marijuana. Johns was subsequently shot and killed.
 {¶ 10} Appellant and Groom were apprehended by police at a home on Summit Street in Toledo early the next morning. Appellant was interviewed twice by detectives during which time he made statements implicating himself in the murder of Johns. Subsequently, appellant filed a motion to suppress the statements he made to detectives during those interviews. Specifically, appellant asserted that hisFifth Amendment rights were violated in that the interviewing officer induced appellant's statements by threatening to charge appellant with a crime if he did not make a statement. Accordingly, appellant argued that his statement was involuntary and should be suppressed. The lower court denied the motion after a hearing on the matter.
 {¶ 11} On June 28, 2005, the case proceeded to a jury trial[1] at which the following witnesses and evidence were presented.
 {¶ 12} Keith Hubbell had been a friend of Steven Johns for approximately seven years before the night of November 28, 1998. Hubbell testified as to the events of that night as follows. Earlier that evening, appellant and his half-brother, Shamus Groom, met up with Keith Hubbell and Jessie Collins. Hubbell had never met appellant or *Page 4 
Groom before but was a friend of Collins. After purchasing alcohol, the foursome returned to a house on Summit Street where Groom lived and appellant had been visiting. After drinking for a while, Shamus said he wanted to get some marijuana. Hubbell indicated that he knew a guy who sold it. Shamus then drove the foursome in a light brown Cadillac to a house at 3544 Elm Street in Toledo, as directed by Hubbell. The group was let into the house by an individual who was leaving. They then sat down and waited for Johns, who was upstairs. After a short time, Johns came downstairs and he and Groom had a conversation about Groom buying some "weed." Hubbell testified that he heard Johns say that he had to go to the south end and that it would take about one-half hour. Hubbell and another individual who had been at the house, Jeremy Caperton, then began to leave the house. Hubbell testified that while he and Jeremy were still on the porch, he heard someone inside say: "ain't nobody goin' nowhere." He then ran back to the front door, saw Groom pull out a pistol and saw Johns and Groom wrestling. Hubbell then turned and ran. As he neared the house next door, Hubbell heard a gunshot. He continued running, retrieved his coat from the car which was about two houses away from 3544 Elm Street, and then heard three more shots in quick succession. Jessie Collins, who had also run from the house, also ran to the car and he and Hubbell then ran to Hubbell's brother's house nearby. From there, Hubbell and Collins went to the home of Collins' girlfriend, Mindy Milam, who had been with them earlier in the evening. When they arrived at Milam's house, appellant and Groom were there. Hubbell testified *Page 5 
that at Milam's house, appellant spun the cylinder of a revolver, said he had three bullets left and said "nobody better not snitch." Hubbell left and went home.
 {¶ 13} Mindy Milam also testified at the trial below. On the afternoon of November 28, 1998, Groom, appellant, and appellant's girlfriend, Jessica, picked up Milam and Collins from Milam's home and drove to a house on Summit Street in Toledo. They spent the afternoon drinking and were then joined by Keith Hubbell. The four boys then left to buy "weed." Milam testified that about an hour later, appellant and Groom returned, acting "anxious." Appellant, Groom, Milam and Jessica then got back into the Cadillac and drove into Michigan, with Groom driving and appellant sitting in the front passenger's seat. Milam testified that she did not know where they were going but that appellant and Groom were talking about an incident in which they were wrestling and someone got shot. In particular, Milam testified that appellant said the person was shot because he did not have any "weed" or money. She also stated that appellant said he initially ran out of the house but then ran back inside. After making a short stop in Michigan, the foursome began to drive back to Toledo, but the Cadillac broke down. Eventually, the foursome got a ride back to Milam's house and appellant and Groom left in a cab.
 {¶ 14} Two witnesses who were at the 3544 Elm Street home the night of the shooting also testified at the trial below. On the evening of November 28, 1998, Sarah Okenka Thompson was visiting her mother, brother and sister at the 3544 Elm Street home. She testified that Johns had been living there with her family, that her sister has *Page 6 
cerebral palsy and is in a wheelchair, and that her brother is deaf and autistic. During the evening when she was watching television, four boys came to the house and talked to Johns. Thompson initially heard the boys make introductions to each other and heard one boy ask Johns if he had any weed for sale. She heard Johns answer "no." Then, as Johns and Jeremy Caperton were about to walk out the front door, one of the boys pulled a gun out of his coat, held it to the right side of Johns' neck and said "give me your shit." Thompson quickly grabbed her brother and ran with him into the kitchen to protect her sister. As she entered the kitchen, she heard the first shot. She then called 911, but one of the boys, who she could not identify, grabbed the phone and attempted to pull it out of the wall. She then heard what sounded like two people running up the stairs. As she took off down the street with her siblings, she heard another gun shot.
 {¶ 15} Jeremy Caperton testified that Steven Johns had been his best friend and that in November 1998, he was living in the house at 3544 Elm Street. On the evening of November 29, 1998, he and Johns were getting ready to go out when Keith Hubbell and three other guys came to the house. Groom then asked Caperton how much Johns charged for one-half ounce of "weed." Caperton did not know, but shortly thereafter, Johns came downstairs. Johns then had a short conversation with Hubbell that Caperton could not hear. Johns then indicated that they were getting ready to leave, and Caperton was out the door when he heard one of the individuals say "ain't nobody going nowhere." When Caperton looked back into the house, he saw Johns struggling with one of the individuals in a green coat and saw a gun in that guy's hand. After hearing the gunshot, *Page 7 
Caperton took off running and hid in a motor home behind the house. A short time later he heard two or three more shots.
 {¶ 16} A number of officers and detectives also testified at the trial below. Through their testimony, the following facts were presented to the jury. When officers arrived at the Elm Street home, they found a trail of blood leading upstairs and found Johns lying in a darkened bedroom. Johns had sustained multiple gun shot wounds but was still alive. The room looked ransacked, the drawers to one of the dressers had been pulled out, and there was blood smeared on the front face of that dresser. When EMTs were administering aid to Johns, they found a baggie of suspected marijuana in his pants and a roll of $632 tucked into his sock. Upon searching the room, officers found a spent nine millimeter shell casing and several baggies of suspected drugs on the floor. In addition, there was a bullet hole in the wall in the living room and a bullet was subsequently removed from that wall.
 {¶ 17} Appellant and Groom were apprehended early the next morning at the Summit Street home. Both suspects were awakened by police officers and placed under arrest. When appellant was awakened and removed from his bed, officers noticed the handle of a gun sticking out from under the mattress. The gun, a Dan Wesson .357 Magnum revolver, was loaded, with three bullets remaining in it, and the hammer was pulled back ready to fire. In searching the home, officers also found a Browning nine millimeter pistol in a laundry basket. That gun contained a magazine. A subsequent search of the Cadillac that Groom was driving earlier that evening, and in which *Page 8 
appellant was riding, revealed two spent shell casings, one .38 Special and one .357. Both were discovered wedged in the front passenger's seat. Detective Keefe Snyder testified that although neither a .38 nor a .357 bullet could be fired from a nine millimeter pistol, both could be fired from a .357 Magnum revolver. With regard to these weapons, the parties entered into stipulations at the trial below with regard to the testimony of Edward Joshua Franks, a firearms and tool mark expert. Those stipulations were read to the jury and contain the following facts. Franks received and examined the two handguns, ammunition, shell casings, three bullets removed from Johns, and one bullet removed from the wall of the Elm Street house. Based on his visual and microscopic examinations, Franks concluded to a reasonable degree of scientific certainty that the bullets removed from Johns' body were fired from the Dan Wesson .357 Magnum revolver and that the bullet removed from the wall was fired from the Browning nine millimeter semi-automatic handgun. He also concluded that the shell casings found in the Cadillac were fired from the .357 Magnum.
 {¶ 18} After he was arrested, appellant was taken to the police department and interviewed twice by Detective Michael Riddle. A video recording of those interviews was played for the jury at the trial below. During those interviews, appellant made statements that incriminated himself in both the murder and attempted robbery of Johns. Appellant stated that after Groom pulled out a gun and said "no one leave," he told appellant to watch the door. Appellant also stated that Groom told Johns "I want your shit." Then, after Groom first shot Johns, Groom told Johns to go upstairs. Appellant *Page 9 
told Riddle that he then saw Groom pull the kitchen phone from the wall and follow Johns upstairs. Appellant stated that he initially ran out of the house but then turned around, went back in and went upstairs. There Groom was yelling at Johns to open the dresser drawers and to hurry up. Appellant stated that Groom wanted money and dope. Appellant denied having a gun with him but stated that after Groom and Johns began wrestling, Johns knocked a gun out of Groom's hand. Appellant then picked up the gun and shot it at Johns.
 {¶ 19} Dr. Diane Scala-Barnett performed an autopsy on Johns and testified that he died as a result of multiple gun shot wounds. One bullet grazed the right side of his temple and ran from front to back. A second bullet entered the right side of Johns' abdomen, penetrated the large intestine, and passed through the lower portion of his spinal cord. A third bullet entered Johns' buttocks, traveled in a forward direction and then ricocheted off the pelvic bone, coming to rest in the pelvic floor. The last bullet recovered from Johns came over his left shoulder, grazed the shoulder, entered at the base of his neck and traveled across his neck, coming to rest on the right side of his neck. Of the four wounds, the grazing wound on the right side of Johns' face and the wound at the front of his abdomen contained stippling. Dr. Scala-Barnett testified that such stippling is caused when a gun is discharged within 12 to 24 inches from the victim and partially burned gun powder burns into the skin. She also testified that the wounds all had different trajectories. At the close of the state's case, appellant moved for an acquittal pursuant to Crim.R. 29. The motion was denied. *Page 10 
 {¶ 20} Appellant called Shamus Groom and Rachael Stoyk to testify in his defense, and also testified himself. Groom testified that on the night in question, he, appellant, Hubbell, Collins, Mindy and Jessica, were hanging out at the Summit Street home of his girlfriend, Stoyk. After drinking for a while, the boys started talking about buying some "weed." Hubbell said he knew where they could buy some, so Groom borrowed $60 from Stoyk and agreed to drive the foursome. Stoyk testified that Groom did ask her for some money and that she gave him $60. Groom stated that before leaving, he grabbed a pistol because he was going to a "dope house" with people he did not know. After they arrived at the Elm Street home, Hubbell introduced Groom to Jeremy Caperton and Groom asked Caperton the price for a half ounce of marijuana. Caperton responded that it was $80. Groom said he only had $60, so they sat down until Johns came downstairs. Johns told him that he would sell it for $60, took Groom's $60 and left the room. Groom testified that when Johns returned he said that he had to go to the south side to get the "weed." Groom then told Johns that if he had to go get the weed he wanted his money back. After further discussion, Groom became agitated, believed that Johns was trying to rip him off and said nobody was going to leave until he got his $60 back. Groom testified that he and Johns then began to struggle when the gun went off. After Johns ran up the stairs, Groom ran after him to get his money back. Groom stated that he ran into a darkened bedroom, stumbled and dropped the gun. Johns then came at him and the two were wrestling when Groom heard three gunshots in short succession. Groom testified that he then looked up and saw appellant. The two then ran *Page 11 
out of the room, but as they were leaving, Groom kicked something on the floor, looked down and saw the Browning nine millimeter pistol. He grabbed the gun and ran out of the house. Groom testified the he took nothing from the house or the victim and never got his $60 back.
 {¶ 21} In his defense, appellant gave the following account of the events of November 28, 1998. While hanging out and drinking with Groom, Collins and the girls, the topic of buying weed came up. Collins said Hubbell knew a guy from whom they could buy marijuana so they went to pick up Hubbell, brought him back to the house and "put a little plan together to get some weed." No one had any money so Groom borrowed money from Racheal Stoyk. Appellant testified that when they got to the Elm Street house, Groom talked to Johns, gave him the money, and that Johns then left the room. When Johns returned, he announced that he had to go to the south side to pick up the weed. Appellant testified that everyone, including himself, started to leave the house when Groom pulled out a gun. Appellant stated that he then ran out of the house and was on the porch when he heard the gun discharge. He continued to run toward the car when he realized that he did not have the car keys and was not familiar with Toledo. He then ran back inside the house, saw the blood trail leading upstairs and followed it. Appellant testified that when he got to the bedroom in which Groom and Johns were fighting, he saw a gun on the floor, picked it up and fired it three times. He stated that all he wanted to do was break up the fight and that he never intended to harm Johns. Appellant also testified that he did not take anything from the house and denied seeing any drawers *Page 12 
being opened when he arrived upstairs. He and Groom then ran out of the house. Appellant stated that when he tried to give the gun back to Groom, Groom said that it was not his. Appellant then believed that the gun must have belonged to Johns. When questioned about statements he made to Detective Riddle after his arrest, appellant stated that he lied to the officer and only told him what he thought he wanted to hear because he believed that he could help himself if he agreed with Riddle's statements.
 {¶ 22} Upon considering all of the evidence, the jury found appellant guilty of aggravated murder in violation of R.C. 2903.01(B), found that appellant was the principle offender in the commission of that offense, and found that appellant had a firearm on or about his person or under his control while committing that offense. The jury also found appellant guilty of aggravated robbery in violation of R.C. 2911.01(A)(1) and found that appellant had a firearm on or about his person or under his control while committing that offense. After a mitigation hearing, the jury recommended a sentence of life imprisonment with the possibility of parole after 30 years. In a judgment entry of July 18, 2005, the trial court imposed that sentence along with three years actual incarceration on the gun specification. The court further imposed a concurrent term of ten years on the aggravated robbery conviction with three years actual incarceration on the gun specification attached to that conviction. It is from that judgment that appellant now appeals.
 {¶ 23} We will first address appellant's third assignment of error in which he challenges the trial court's denial of his motion to suppress. Appellant asserts that the *Page 13 
statements he gave to officers during his interrogation were not voluntary because he was told, prior to the invocation of his Miranda rights, that if he did not make a statement he would be treated as a participant in the homicide. As such, he contends that he was improperly induced to speak to the detectives and his statements were inadmissible.
 {¶ 24} Appellate review of a decision on a motion to suppress presents a mixed question of law and fact. State v. Davis (1999),133 Ohio App.3d 114, 117. In ruling on a motion to suppress, the trial court assumes the role of trier of fact and, as such, is in the best position to resolve questions of fact and evaluate witness credibility. State v. Smith
(1997), 80 Ohio St.3d 89, 105. Accordingly, this court is bound to accept the trial court's findings of fact if they are supported by competent, credible evidence. State v. Rhude (1993), 91 Ohio App.3d 623,626; State v. Guysinger (1993), 86 Ohio App.3d 592, 594. Accepting those facts as true, this court must independently determine as a matter of law, without deference to the trial court's conclusion, whether they meet the applicable legal standard. State v. Klein (1991),73 Ohio App.3d 486, 488.
 {¶ 25} In order for a statement made by an accused to be admitted in evidence, the prosecution must prove by a preponderance of the evidence that the accused effected a voluntary, knowing and intelligent waiver of his Fifth Amendment right against self-incrimination. State v.Arrington (1984), 14 Ohio App.3d 111, 114. "A suspect's decision to waive his Fifth Amendment privilege against compulsory self-incrimination is made voluntarily absent evidence that his will was overborne and his capacity for self-determination was critically impaired because of coercive police conduct." State v. *Page 14 Dailey (1990), 53 Ohio St.3d 88, paragraph two of the syllabus, citingColorado v. Spring (1987), 479 U.S. 564, 574. "In deciding whether a defendant's confession is involuntarily induced, the court should consider the totality of the circumstances, including the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement."State v. Edwards (1976), 49 Ohio St.2d 31, paragraph two of the syllabus, vacated in part on other grounds (1978), 438 U.S. 911. The presence of promises does not, as a matter of law, render a confession involuntary, Id. at 41, and "[promises that a defendant's cooperation would be considered in the disposition of the case, or that a confession would be helpful, do not invalidate an otherwise legal confession."State v. Loza (1994), 71 Ohio St.3d 61, 67, citing Edwards, supra at 40-41, overruled on other grounds. As we stated in Arrington, supra, in determining whether police conduct has induced an involuntary statement, rather than considering the bare language of the inducement, we must consider "`the nature of the benefit to be derived by a defendant if he speaks the truth.'" Arrington, supra at 114-115, citing People v.Flores (1983), 144 Cal.App.3d 459, 192 Cal.Rptr. 772, 776-777.
 {¶ 26} Appellant asserts that the statements he made to Detective Riddle shortly after his arrest were involuntary because he was induced to make them by Riddle's statement: "If you don't make a statement, I'll treat you as a participant in a homicide." Appellant contends that implied in this statement is the promise that if he did make a statement he would not be treated as a participant. That statement, however, cannot be *Page 15 
viewed in a vacuum. As stated above we must look at the totality of the circumstances to determine if appellant's statement was voluntary. The tape recording of the interrogation was played for the court at the hearing on the motion to suppress and reveals the following. Before Riddle read appellant his Miranda rights, he learned from appellant that he was 16 years old and had been in trouble before, although "nothing really big." Riddle then told appellant that he was in a situation in which only he could help himself, that the officers knew he was involved in the shooting at Elm Street, and that they had found a gun under his mattress when he was arrested. Riddle further informed appellant that if he was not the shooter, but stuck by Groom, he would be treated as a complicitor and could receive a life sentence. It was at that point that Riddle made the statement quoted above. Riddle then read appellant his Miranda rights and received an acknowledgement from appellant that he understood those rights. Finally, Riddle stated: "We're not going to pressure you to talk to us. Do you understand that?" To which appellant replied: "Yes." Appellant then signed the waiver form and spoke to Riddle about the events of the night.
 {¶ 27} Upon a review of the totality of the circumstances in this case, we cannot say that appellant's will was overborne by coercive police conduct. Appellant was already under arrest and was informed of the seriousness of the charges he was facing. Riddle's statement did not amount to a promise of leniency if appellant made a statement. Rather, as noted by the trial court, any implication of leniency was dependent on the content of the statement made by appellant. Nothing in the record before us leads us to *Page 16 
conclude that appellant's statement was involuntary or coerced in any way. Accordingly, the lower court did not err in denying the motion to suppress and the third assignment of error is not well-taken.
 {¶ 28} In his first assignment of error, appellant asserts that the trial court erred in failing to instruct the jury on the lesser included offense of involuntary manslaughter in the commission of a misdemeanor, specifically the purchase of marijuana. Appellant's trial counsel sought this instruction at the trial below and his request was denied. He now contends that the court's failure to instruct the jury on this lesser included offense deprived him of his absolute right to present a defense.
 {¶ 29} A defendant may be found guilty of a lesser included offense even if the lesser offense is not included in the indictment. White v.Maxwell (1963), 174 Ohio St. 186, 188. A determination of whether an instruction on a lesser included offense is warranted involves a two-step process. First, the trial court "must determine what constitutes a lesser included offense of the charged crime; second, it must examine the facts and ascertain whether the jury could reasonably conclude that the evidence supports a conviction for the lesser offense and not the greater." State v. Kidder (1987), 32 Ohio St.3d 279, 280. InState v. Thomas (1988), 40 Ohio St.3d 213, paragraph two of the syllabus, the Supreme Court of Ohio held that a charge on a lesser included offense is required "only where the evidence presented at trial would reasonably support both an acquittal on the crime charged and a conviction upon the lesser included offense." *Page 17 
 {¶ 30} Appellant was convicted of aggravated felony murder in violation of R.C. 2903.01(B). It is well-settled that involuntary manslaughter, R.C. 2903.04, is a lesser included offense of aggravated felony murder, "because the only distinguishing factor is the mental state involved in the act." State v. Lynch, 98 Ohio St.3d 514,2003-Ohio-2284, ¶ 79. The lower court recognized this distinction when it instructed the jury on involuntary manslaughter in the commission of a felony, R.C. 2903.04(A). That is, the court recognized that appellant's mental state was at issue, for aggravated felony murder requires a culpable mental state of "purpose" and involuntary manslaughter carries with it the culpable mental state of the underlying crime being committed, in this case aggravated robbery as proscribed in R.C. 2911.01(A). That statute provides in relevant part:
 {¶ 31} "(A) No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall do any of the following:
 {¶ 32} "(1) Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it[.]"
 {¶ 33} Under R.C. 2913.01(K), a theft offense includes a violation of R.C. 2913.02, which reads in relevant part: *Page 18 
 {¶ 34} "(A) No person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services in any of the following ways:
 {¶ 35} "(1) Without the consent of the owner or person authorized to give consent;
 {¶ 36} "* * *
 {¶ 37} "(4) By threat."
 {¶ 38} Appellant, however, also asserts that whether he shot Johns while attempting to purchase marijuana was also at issue. Therefore, the court should have also instructed the jury on involuntary manslaughter in the commission of a misdemeanor, R.C. 2903.04(B). Simply because appellant and his cohorts originally arrived at the Elm Street house under the guise of purchasing marijuana does not automatically entitle appellant to a jury instruction on involuntary manslaughter in the commission of a misdemeanor. "The mere fact that an offense can be a lesser included offense of another does not mean that a court must instruct on both offenses where the greater offense is charged. * * * [Juries are] not to be presented with compromise offenses which could not possibly be sustained by the adduced facts." State v. Wilkins
(1980), 64 Ohio St.2d 382, 387, citing State v. Nolton (1969),19 Ohio St.2d 133.
 {¶ 39} The evidence from the trial below reveals that although appellant and the three other young men talked about buying marijuana, and originally went to the Elm Street house with that goal in mind, the situation quickly evolved into an armed robbery *Page 19 
when Groom pulled out a gun, ordered no one to leave the house, ordered appellant to watch the door, and told Johns "I want your shit." Then, according to appellant's testimony, appellant ran from the home. After reaching the car, however, appellant turned and went back inside the house, knowing that Groom had already shot Johns, had pulled the phone from the wall and had ordered Johns to go upstairs. That is, appellant went back inside the house knowing that a crime other than the purchase of marijuana was occurring. Appellant told Detective Riddle that when he got upstairs, Groom was ordering Johns to open up dresser drawers. Indeed, when detectives arrived on the scene, they found dresser drawers opened and blood smeared on the top edges of the drawers. Under these circumstances, it is inconceivable that a jury could have concluded that appellant and Groom were still attempting to purchase marijuana when appellant shot Johns three times, once at close range. Accordingly, the trial court did not err in refusing to charge the jury on involuntary manslaughter in the commission of a misdemeanor and the first assignment of error is not well-taken.
 {¶ 40} Finally, in his second assignment of error, appellant asserts that the trial court erred in denying his Crim.R. 29 motion for acquittal at the close of the state's case in chief. Specifically, appellant contends that the state failed to present sufficient evidence to establish that a robbery took place at the Elm Street home or that a robbery was even attempted. As such, appellant contends that the evidence was insufficient to sustain a conviction for aggravated felony murder. *Page 20 
 {¶ 41} When reviewing the denial of a Crim.R. 29(A) motion, an appellate court evaluates whether the evidence is such that reasonable minds can differ as to whether each material element of the crime charged has been proven beyond a reasonable doubt. See State v.Bridgeman (1978), 55 Ohio St.2d 261, 263. The standard is the same as is used to review a sufficiency of the evidence claim. State v. Carter
(1995), 72 Ohio St.3d 545, 553. The test is, viewing the evidence in a light most favorable to the prosecution, could any rational trier of fact have found the essential elements of the crime proven beyond a reasonable doubt. State v. Thompkins (1997), 78 Ohio St.3d 380, 390
(Cook, J., concurring), superceded by state constitutional amendment on other grounds.
 {¶ 42} The elements of aggravated robbery are set forth above. Appellant contends that because there was no evidence that he and Groom had planned to rob Johns, no evidence that anything was taken from Johns and evidence that a substantial sum of money and marijuana were recovered from Johns' room, there was no evidence to support a finding that a robbery took place or was even attempted. We disagree. From the evidence submitted at the trial below, a reasonable jury could have concluded that even if appellant and the other boys originally went to Elm Street with the purpose of purchasing marijuana, the situation quickly turned into an aggravated robbery when Groom pulled out a gun, told appellant to watch the door, said "ain't nobody goin' nowhere," and told Johns to "give me your shit." Appellant's own statements to Detective Riddle, which were videotaped and shown to the jury below, were particularly incriminating. From those statements, the jury could have concluded that appellant knew *Page 21 
Groom was robbing Johns when appellant decided to run back into the house and, therefore, could have concluded that appellant ran back in to help. Based on ballistics evidence, it is conceivable that the jury did not believe appellant's statement that he used the gun dropped by Groom to shoot Johns. The gun that Groom used to shoot Johns downstairs, and which caused the graze wound to his head, was a Browning nine millimeter pistol. The three bullets removed from Johns all came from the .357 Magnum revolver which was found in appellant's possession the next morning. The jury, therefore, could have concluded that appellant ran back inside the house already armed to assist in the robbery. Finally, although Mindy Milam initially testified that appellant said Johns was shot because he did not have any marijuana, after being shown her prior testimony, she admitted that appellant said Johns was shot because he did not give them any marijuana or money.
 {¶ 43} We therefore conclude, upon a thorough review of the record, that a jury could have found beyond a reasonable doubt that appellant, in attempting to commit a theft offense, had a deadly weapon on or about his person or under his control and used it.[2] Accordingly, because there was sufficient evidence to sustain convictions on all of the offenses charged, the lower court did not err in denying the motion for acquittal and the third assignment of error is not well-taken. *Page 22 
 {¶ 44} On consideration whereof, the court finds that appellant was not prejudiced or prevented from having a fair trial and the judgment of the Lucas County Court of Common Pleas is affirmed. Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24. Judgment for the clerk's expense incurred in preparation of the record, fees allowed by law, and the fee for filing the appeal is awarded to Lucas County.
JUDGMENT AFFIRMED.
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4.
JUDGE Mark L. Pietrykowski, P.J.
JUDGE Arlene Singer, J.
JUDGE George M. Glasser, J.
CONCUR.
Judge George M. Glasser, retired, sitting by assignment of the Chief Justice of the Supreme Court of Ohio.
[1] Appellant was originally convicted of the same crimes after a trial to a single judge. In a decision and judgment entry of February 7, 2003, we reversed that conviction and remanded the case for a new trial. See State v. Koger, 151 Ohio App.3d 534, 2003-Ohio-576. In that case we concluded that although appellant was ineligible to receive the death penalty, he was nonetheless charged with a capital offense and, accordingly, was required to be tried by a jury or a three judge panel.
[2] We reach this conclusion knowing full well that Groom was found guilty of murder but was acquitted on aggravated felony murder and aggravated robbery charges. See State v. Groom (Oct. 19, 2001), 6th Dist. No. L-00-1104. Appellant's videotaped statements to Detective Riddle, however, were particularly damaging to appellant's defense in this case. *Page 1