The STATE of Ohio, Appellee,

v.

PATTERSON, Appellant.

[Cite as *State v. Patterson* (1993), 95 Ohio App.3d 255.]

Court of Appeals of Ohio,
Lake County.

No. 92–L–029.

Decided Oct. 4, 1993.

*Steven C. LaTourette,* Lake County Prosecuting Attorney, and *Kimberly A. Mahaney,* Assistant Prosecuting Attorney, for appellee.

*James L. Wagner,* for appellant.

CHRISTLEY, Presiding Judge.

This appeal arose from the conviction of the appellant, Van W. Patterson, on twenty-seven counts, including aggravated burglary, robbery, grand theft, sexual

imposition, attempted aggravated burglary, and possession of criminal tools. Twenty of the original forty-seven counts had been dismissed by the prosecutor prior to trial. Also prior to trial, appellant's motion to suppress was denied. Following the guilty verdict and sentencing, a timely appeal followed, containing one assignment of error:

"The trial court erred to the prejudice of defendant-appellant in overruling his pretrial motion to suppress evidence."

Appellant raised several issues in this motion to suppress. The first was that the initial stop was unconstitutional and as a result all written and oral statements of the appellant subsequent to that stop should have been suppressed.

The state argued at the suppression hearing that the following facts demonstrated the existence of specific and articulable facts which would reasonably warrant the stopping of appellant's automobile. Patrolman Kerzisnik testified that there had been a recent rash of burglaries by the infamous "BVD Bandit" in the several apartment complexes adjacent to where the instant stop and arrest took place. He further testified that various victims and witnesses had provided considerable information as to the mode of escape of the burglar. Based on this information, the police surmised that, although the burglar always escaped on foot, he either had a car parked close by, possibly driven by an accomplice, or that he or an accomplice lived in the area.

In investigating one of the recent burglaries which occurred less than a quarter of a mile away from the arrest scene, Kerzisnik testified that a witness saw the burglar run west from Liberty Lane towards Oakridge, the road where the stop at issue took place.

On the night in question, Kerzisnik answered a prowler call at 2:22 a.m. in the vicinity of the previous burglaries. He knew that another patrol car had been dispatched to the actual site of the call, and on his way to the area, noticed other police cars deployed in the area. As a result Kerzisnik drove to Oakridge; he testified that "because of my prior knowledge of the burglary that occurred right near there just previously, a few days it was before, and that the subject ran towards Oakridge. * * * Once I saw the deployment of the other police units I specifically headed for Oakridge to cover that escape route because the suspect had just run there days earlier on the last investigation I had at Liberty Lane."

When he arrived at Oakridge about 2:30 a.m., he noticed a vehicle heading south on Hickory Lane, a cul-de-sac off Oakridge. It was a light-colored Escort or Lynx with a solitary male driver. Kerzisnik briefly stopped to investigate a porch light that suddenly went on, thinking that it might have been a motion sensitive light. At the end of this interval of three to ten minutes, he again

observed the same vehicle, this time going north. He stated that he decided to stop the car for the following reasons:

"Just the fact that the person, that was unusual behavior, he might not possibly belong in that area. That we knew that the burglar had fled on foot, but possibly had a car in the vicinity. He had to be getting to the site of his crimes. The crimes occurred in various cities and he obviously couldn't walk from great distances from one city to the other. And I just thought, it's a cul-de-sac street. Often people get lost * * *.

"I just thought that there's no reason on a week night at 2:30 in the morning a person would come home, leave right away again. I thought this guy may not belong in this area. There was no traffic, there were no people out * * *.

"I thought it may be connected. I wanted to see why this person was out and about, when he was the only person out and about, and we had just had a crime occur minutes before in close proximity to where he was. And coupled with the fact that his behavior was unusual for any legitimate purpose, for what I thought at the time was a legitimate reason. If he was a resident or friend of a resident in that area, what's he doing there twice in just a couple minutes."

■ The actions of a police officer in attempting to apprehend a suspect involved in a crime which was committed at a time and place proximate to the stop cannot be viewed from the same perspective as a stop which is made without the proximity of an immediate criminal event. The prosecutor aptly cites *State v. Comen* (1990), 50 Ohio St.3d 206, 553 N.E.2d 640. There the fact situation was very similar. In determining whether that investigative stop was justified, the court referred to its previous decision in *State v. Bobo* (1988), 37 Ohio St.3d 177, 524 N.E.2d 489. There, in paragraph one of the syllabus, it had held:

"The propriety of an investigative stop by a police officer must be viewed in light of the totality of the surrounding circumstances. (*State v. Freeman* [1980], 64 Ohio St.2d 291, 18 O.O.3d [472], 414 N.E.2d 1044, paragraph one of the syllabus, approved and followed.)"

■ In arguing that no specific and articulable facts were given by the patrolman, appellant ignores the fact that Patrolman Kerzisnik was responding to a call of a prowler in the precise quarter mile area where the prowler had just been reported and where a series of burglaries had recently taken place, and that Kerzisnik had deliberately stationed himself at what the police had determined to be the likely escape route.

As to why Kerzisnik didn't stop appellant's car the first time he saw it, it was clear that he initially felt the car might belong to a resident returning home after the bars closed. However, when the car reemerged, that indicated to him that

the driver was someone unfamiliar with the cul-de-sac. Further, he testified there was "no traffic" and "he was the only person out and about."

We therefore find that specific and articulable facts existed which would lead the patrolman to reasonably believe that appellant might have been the prowler sought.

The next issue raised by appellant is that:

"Consistent with the Fourth Amendment of the United States Constitution and Article I Section 14 of the Ohio Constitution, a patrolman may not make a detailed search of the passenger compartment of an automobile, under the front seat specifically, based solely on consent given in response to the patrolman's statement 'You don't mind if I take a peek in the car, do you?' or ' * * * look in the car, do you?' or 'You don't mind if I check the car, do you?' "

 The burden of proving consent to a warrantless search by clear and positive evidence is on the prosecution. *State v. Danby* (1983), 11 Ohio App.3d 38, 11 OBR 71, 463 N.E.2d 47; *United States v. Jones* (C.A.6, 1981), 641 F.2d 425. The validity of the consent is a question of fact and depends on whether the consent was freely and voluntarily given and not the result of duress or coercion, either express or implied. Although a factor, there does not have to be a demonstration by the prosecution that the appellant knew he had a right to refuse consent. *Schneckloth v. Bustamonte* (1973), 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854.

Other than the fact that the officer had stopped his vehicle, there is simply nothing of record to indicate that intimidation, duress or coercion was used in obtaining appellant's consent. In fact, the officer even informed appellant exactly why he stopped him before he made his request.

 The next facet of this issue is whether the patrolman exceeded the scope of the consent obtained when he looked under the front seat. The trend of federal decisions is clearly in favor of a standard of reasonableness. *United States v. Strickland* (C.A.11, 1990), 902 F.2d 937; *Canada v. State* (1988), 104 Nev. 288, 756 P.2d 552; *United States v. $83,900 in U.S. Currency* (D.Kan.1991), 774 F.Supp. 1305, citing *Florida v. Jimeno* (1991), 500 U.S. 248, 111 S.Ct. 1801, 114 L.Ed.2d 297. In *Jimeno*, the court referred to " 'objective' reasonableness— what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Id.* at 251, 111 S.Ct. at 1803–1804, 114 L.Ed.2d at 302. Using this standard, the court found that Jimeno's general consent to search the car included permission to *open* a folded paper bag found on the floorboards. The instant search was much more innocuous and, thus, "objectively reasonable."

We, therefore, agree with the trial court's conclusion and find that looking under the passenger's seat was not unreasonable in terms of the very broad consent given.

The third issue presented for review is:

"In accordance with the Fifth Amendment of the United States Constitution and Article I Section 10 of the Ohio Constitution, the admissibility of a confession depends on whether the confession was voluntarily given viewed under the totality of the circumstances."

The issue as to whether there was a knowing and intelligent waiver of appellant's *Miranda* rights is not before us. However, "formal compliance with the requirements of *Miranda* does not preclude proof that the statements themselves were involuntary." *State v. Chase* (1978), 55 Ohio St.2d 237, 246, 9 O.O.3d 180, 185, 378 N.E.2d 1064, 1070.

■ It is well established that in order for a custodial confession to be admissible, the prosecution must prove by a preponderance of the evidence that the confession was voluntary rather than compelled. *Leo v. Twomey* (1972), 404 U.S. 477, 489, 92 S.Ct. 619, 627, 30 L.Ed.2d 618, 627; see, also, *State v. Arrington* (1984), 14 Ohio App.3d 111, 14 OBR 125, 470 N.E.2d 211. In *Colorado v. Connelly* (1986), 479 U.S. 157, 167, 107 S.Ct. 515, 522, 93 L.Ed.2d 473, 484, the Supreme Court held that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." As to any inquiry into a defendant's unique mental condition, absent such police misconduct, "the Constitution rightly leaves this sort of inquiry to be resolved by state laws governing the admission of evidence and erects no standard of its own in this area." *Id.* at 167, 107 S.Ct. at 521, 93 L.Ed.2d at 484.

In a case decided prior to *Connelly*, the Ohio Supreme Court held:

"In deciding whether the defendant's confession in this case was involuntarily induced, the court should consider the *totality* of the circumstances, including the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement." (Emphasis *sic.*) *State v. Edwards* (1976), 49 Ohio St.2d 31, 40–41, 3 O.O.3d 18, 23, 358 N.E.2d 1051, 1059, vacated in part on other grounds (1978), 438 U.S. 911, 98 S.Ct. 3147, 57 L.Ed.2d 1155.

In *Edwards*, although the defendant was kept continuously in an interrogation room for over nine hours and interrogated four times, the court held that:

" * * * The accused in the instant case had been given his rights and was of majority age. The defendant, at the time of his first confession, had been in custody for approximately one hour. The atmosphere was noncoercive and the questioning had not been continuous. There was no physical deprivation or mistreatment. The record supports the finding that the defendant voluntarily waived his constitutional rights." *Id.,* 49 Ohio St.2d at 41, 3 O.O.3d at 24, 358 N.E.2d at 1059.

Similarly, in *State v. Barker* (1978), 53 Ohio St.2d 135, 141, 7 O.O.3d 213, 217, 372 N.E.2d 1324, 1330, the court affirmed a finding that a defendant's confession was not coerced, stating:

" * * * Although he was in association with the police for slightly more than seven hours, the questioning was neither continuous nor coercive. Furthermore, there was no evidence of physical deprivation or mistreatment. The record can support only the conclusion that the confession was not induced by duress, intimidation, or other improper influences and, therefore, was voluntary and admissible. * * * "

In *State v. Dailey* (1990), 53 Ohio St.3d 88, 559 N.E.2d 459, the trial court had granted defendant's motion to suppress his confession on the grounds that he was eighteen years old, possessed an I.Q. of only 71, and, therefore, given the custodial nature of the investigation, the confession was not voluntary. The court of appeals affirmed. The Supreme Court reversed, stating, "The record in this case is devoid of any suggestion that the chief deputy resorted to physical or psychological pressure to elicit a statement from defendant." *Id.* at 92, 559 N.E.2d at 463.

The Ohio Supreme Court has held that absent evidence that a defendant's will and self-determination are overcome by coercive police action, the decision to waive the privilege against self-incrimination is voluntary. *Id.*

The following facts surrounding the interrogation of the appellant at the police station are compelling and support the trial court's denial of the suppression motion.

Police Officer Kerzisnik indicated in his testimony that it was his understanding that appellant didn't get off work until 10:00 p.m. Officer Cooper testified that during the interrogation, appellant told him that:

"When he would go out and prowl for the purpose of breaking into these places he would always leave late in the evening, and sometimes prowl until early morning hours, 5, 6 o'clock in the morning. * * * I don't believe he went in to work real early. I think he had a job that started later on, in the early afternoon hours, or something. He got off, I think, at 9 or 10 o'clock at night. So his morning hours were to himself."

The involved police officers testified to the effect that appellant was fairly impressive with his ability to recall and recount the various incidents in great and meticulous detail. This was consistent with the essence of Kerzisnik's testimony that appellant was a night owl. Most of the officers also had similar recollections that appellant appeared relieved to be able to finally confide in someone.

There was testimony that a phone was directly available on the table in the interview room, that appellant was offered refreshment and restroom breaks, that he was free to stand up and walk around the room, that he did in fact call his mother, and that he had breaks between the various interviews, with the first one being at least two hours in duration.

The testimony indicated that appellant's car was stopped shortly after 2:30 a.m. His stay at the police station began at shortly after 3:00 a.m.; the initial interrogation began at 3:20 and lasted until approximately 4:30; a tape was then made, beginning at 4:50 a.m. and ending at 5:15 a.m. As previously mentioned, there was a two-hour break, during which the appellant was placed in a temporary holding cell. The interview with the Mentor police began next. Thereafter there were short breaks between interviews. The final interview concluded shortly after 1:00 p.m.

It is also clear that appellant admitted his role in the overall series of crimes within the first few minutes of the first interview with Detective Cooper and Officer Kerzisnik. The balance of that interview was devoted to sorting out the specific details of the crimes committed in Willoughby and eliminating crimes which appellant had not committed. This was essentially the format for the remaining interviews with the officers from the other jurisdictions.

The testimony of the interrogating officers was consistent that appellant exhibited none of the usual signs of fatigue; his speech was clear and controlled, his sentences were complete, he was attentive and there was no nodding off. Again as previously mentioned, they all made some kind of comment regarding appellant's ability to recount minute details.

There is nothing in the record to indicate that appellant's various admissions and confessions were coerced or induced by fatigue or intimidation. To the contrary, appellant gave every indication of being accustomed to late night hours as well as exhibiting great relief at finally being able to get rid of his burden. It is also clear that the police officers involved were painstaking in regard to administering appellant's *Miranda* rights and readministering them, especially during the first few hours of the process. We, therefore, agree there was no violation of either the Ohio or the United States Constitution.

*Judgment affirmed.*

JOSEPH E. MAHONEY, J., concurs.

NADER, J., dissents.

NADER, Judge, dissenting.

While congratulating Patrolman Kerzisnik for the accuracy of his suspicions in apprehending the appellant, I must dissent with the majority that such apprehension was permissible.

A police stop of a vehicle is a significant intrusion which requires justification of a seizure under the Fourth and Fourteenth Amendments to the United States Constitution. *Delaware v. Prouse* (1979), 440 U.S. 648, 653, 99 S.Ct. 1391, 1395, 59 L.Ed.2d 660, 667. A police officer cannot cause an investigative stop without at least "specific and articulable facts" that would support the officer's belief that a crime had been committed or was being committed. *Terry v. Ohio* (1968), 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889.

Appellant's only observed action was driving into and out of a residential cul-de-sac within a three-to-twenty-minute interval at approximately 2:30 a.m., after a report had been made of a prowler on foot a quarter mile or more away from the area. I fail to see how these facts could create a rational inference that he was involved in criminal activity.

The mere reason that the arresting officer "thought it was unusual" for a person to drive alone in and out of a residential cul-de-sac at 2:30 a.m., and to be the only observed person in close proximity to a prowler complaint does not present "specific and articulable facts" to support rational inferences which would warrant the officer to stop appellant.

Absolutely nothing observed by Patrolman Kerzisnik would distinguish appellant's actions from those of any person who may have driven past him that morning. His actions were entirely consistent with innocent behavior. See *State v. Bird* (1988), 49 Ohio App.3d 156, 157, 551 N.E.2d 622, 623.

Because the initial stop was improper, all evidence obtained therefrom is inadmissible and no further discussion is required regarding the enlargement of the scope of the permitted search or the marathon interrogation. *Terry*, 392 U.S. at 15, 88 S.Ct. at 1876, 20 L.Ed.2d at 902.

Police work is result oriented; however, it is the duty of the judiciary to protect the rights of individuals, reserved in the Constitution, from encroachment by the government in its exercise of the powers entrusted to it. The judiciary's failure to fulfill this duty for expediency in the containment of criminals will ultimately permit them to decimate all of our rights, by their apprehension, as well as by their unlawful activity.

I believe the trial court erred in not granting appellant's motion to suppress.