OPINION
{¶ 1} Defendant-appellant Eugene Farley appeals from his conviction and sentence, following a no-contest plea, for Attempted Gross Sexual Imposition. Farley contends that the trial court erred by denying his motion to suppress incriminating statements he gave to police officers, because those statements were not voluntarily made. Farley also contends that the trial court erred by considering, in connection with the imposition of sentence, his lack of remorse, given that his no-contest plea was accompanied by a protestation of innocence, pursuant to North Carolina v. Alford (1970), 400 U.S. 25. We conclude, after having reviewed a videotape of Farley's entire interview with police officers, which was received in evidence, that Farley's statements were voluntarily made. We further conclude that the trial court did not err by considering Farley's lack of remorse in connection with the imposition of sentence, especially since it appears that this factor was not given much weight. Accordingly, the judgment of the trial court is Affirmed.
 I {¶ 2} In January, 2001, Farley voluntarily arrived at the Miami County Sheriff's Department to answer recent allegations that he had inappropriately touched the breasts and vagina of an eight-year-old girl in 1995. A videotape of Farley's interview with Detectives Lord and Shafer was received in evidence, and the parties agreed that it encompasses the entirety of that interview.
 {¶ 3} This court has reviewed the entire videotape, which runs from one and half to two hours.
 {¶ 4} At the outset of the interview, Detective Steve Lord advised Farley that Farley is there voluntarily, that the door to the interview room is not locked, that Farley is free to leave at any time, and that the door is only being closed to facilitate a voice stress analysis to which Farley has agreed to submit, and also for the sake of Farley's privacy. After eliciting Farley's denial that anything improper occurred between himself and the victim, Lord explained the voice stress analysis procedure, and went over the ten yes-or-no questions that Farley would answer during the test. These included two questions relating to the substance of the allegations, and eight test questions. With respect to the questions pertaining to the allegations, Lord sought Farley's input to make sure that the questions were fair, and would not inadvertently encompass unrelated misconduct that might, even unconsciously, cause Farley stress.
 {¶ 5} After the test, Lord excused himself for some time to review the results. He had explained to Farley that he would be conferring with another qualified operator, who had not seen Farley, for a second opinion.
 {¶ 6} When Lord returned, he told Farley that there were signs of stress, indicating either that Farley had been untruthful, or that he had not told complete truth concerning the allegations. There then ensued a long dialogue between Farley and Lord. We agree with Farley that Lord is overwhelmingly the dominant speaker, interspersed with short responses by Farley. In this dialogue, Lord attempted to get Farley to admit the truth of what happened. Lord explained that in the context of sex crimes, the allegations against Farley are not that serious. Lord told Farley that if he would just tell the truth, Lord could take the case to a prosecutor, and things would go better for Farley, both the prosecutor and the judge would be inclined to be more lenient if Farley is cooperative.
 {¶ 7} At some point during this dialogue, it became clear that one of Farley's concerns was to avoid publicity. Farley indicated that he had just got a good job, and was about to marry. Lord seized upon this motivation to explain to Farley that if Farley would just admit what happened, the whole matter could be handled quietly and expeditiously. Lord told Farley that he could probably get the prosecutor to go easy on Farley if Farley would just tell the truth, and pass a second test. However, if Farley keeps failing the voice stress analysis tests, the prosecutor is not likely to be sympathetic. Lord used this approach to try to get Farley to acknowledge what happened, so that Farley could pass a second test, where the questions are framed in light of what did occur. Lord then told Farley that the alleged victim took the voice stress analysis test, and passed. Specifically, her affirmative responses to questions whether Farley had touched her vagina, and whether Farley had placed her hand on his penis, passed the voice stress analysis test.
 {¶ 8} Lord finally got Farley to admit that he might have touched the victim on the outside of her panties, but not that he put her hand on his penis.
 {¶ 9} Lord then administered a second voice stress analysis test. After this test, but before Lord left to interpret the results, Lord got Farley to acknowledge that he might have been sexually aroused "the slightest bit," when he touched "her private area," while they were wrestling. He also got Farley to admit that even though his victim was wearing panties, he might have touched her vagina directly. Lord then left the room to interpret the results.
 {¶ 10} Lord did not return, but Deputy Phil Shafer came into the room. With respect to the two tests, Shafer told Farley, "It kinda looks like the first one you did the poorest on."
 {¶ 11} After some discussion of the facts, Shafer started stressing the relative lack of publicity that would attend Farley's cooperation:
 {¶ 12} "What we generally do on these kind of cases; like I said, if they are pretty close together, we suggest you get an attorney and try to get a plea on a bill of information. When there is a lot of difference, we generally take it to the grand jury. If you take it to an attorney and you plead on a bill of information, there is very little publicity. If it goes to Grand Jury, it goes to the papers."
 {¶ 13} Farley then indicated that to avoid publicity, "I'll admit to it." Shafer responded: "No wait. I'm not telling you to admit to something you didn't do. I'm saying it is possible these things happen. Maybe you have forgotten over time or whatever."
 {¶ 14} There was then some discussion whether Farley could afford an attorney, and Shafer told him that if he could not afford an attorney, he could get the Public Defender's office to represent him.
 {¶ 15} There was then some more discussion about what happened. Although Farley continued to deny that he had the victim touch his penis, he finally acknowledged that it is possible that she could have run her hand across the top of his penis while she was touching his thigh.
 {¶ 16} The conclusion of the interview is worth setting forth in some detail. The following is taken from a transcript that was prepared from the videotape. This transcript was also received in evidence.
 {¶ 17} "PS Now what this is called Eugene, it is called Gross Sexual Imposition. It is a felony of the third degree which is not as bad as rape or intercourse with her or oral sex or anything like that but it is sexual touching for somebody under the age of thirteen. A lot of things can happen, I mean. Probation, treatment, counseling, no contact.
 {¶ 18} "EF Even when just, it is not like I do this.
 {¶ 19} "PS You don't have any record, that I can see. Sometimes this just happens
 {¶ 20} once, an opportunistic thing that just takes place. You know, it never happened before and I think they take that into consideration, you know, and I think that is where the Public Defender comes in. He talks about history, friends, getting married, one thing or another, you haven't had any problems since then.
 {¶ 21} "EF Or before then.
 {¶ 22} "PS There is no record before then, so you know, we are just talking about one time frame when you knew this girl and this may have happened a couple of times. The opportunity presented itself, she wasn't trying, she wasn't help [sic] things any, you know. That's over with, but I'll. I think the best thing to do is to, it wouldn't do be [sic] any good, probably wrong if I call the Public Defenders office but you should call them and they will say, okay, you come in and they will look at your finances and yes, you qualify and what they will do is call me and I'll put them in touch with the Prosecutor so they can get right on it and get this resolved probably within thirty days.
 {¶ 23} "EF That would be nice.
 {¶ 24} "PS If they can do that, but it takes a lot, to me it takes a lot of courage to come in and talk about something like this. It's been a while but still you know, the kind of thing you don't want a lot of stuff out on it.
 {¶ 25} "EF I don't want —
 {¶ 26} "PS But if you made a deal it is with the Public Defender or a court appointed attorney and try to get some kind of arrangement with the Prosecutor for what he feels like you should do and not take the thing to trial.
 {¶ 27} "EF I don't want to go trial.
 {¶ 28} "PS I'm not guilty and then the thing is set for trial and the media sits there and watches the whole thing. Can you do that Monday sometime?
 {¶ 29} "EF What is that?
 {¶ 30} "PS Call and then see them after work or something and try and get. What I'm saying Eugene, the sooner you do it and get things rolling on this. I could do it, but what they will do is call me anyway but they will want to talk to you first. They don't want me telling my side, you know. They will say let us talk to our client and see if he is qualified and we will get back to you so you have to initiate it.
 {¶ 31} "EF Yea.
 {¶ 32} "PS But I will be glad to talk to them and tell them, here is the situation. He needs to get this resolved. I'll put you in touch with the Prosecutor, nothing has been filed, he hasn't been arrested and if you want to do this before any of that takes place, why, we are willing to wait until you do it.
 {¶ 33} "EF I can call him Monday at lunch.
 {¶ 34} "PS Okay, will you remember to do that then or?
 {¶ 35} "EF Yes, but I need a number.
 {¶ 36} "PS Okay, why don't we go down to my office and I will get you a card and you can give them a call at lunchtime and it is possible you can see them after work."
 {¶ 37} It appears from the record that the disposition of this case was not handled as expeditiously as Farley might have hoped, a negotiated plea having been agreed to only on the eve of trial. It cannot be determined from the record who or what was responsible for the fact that a plea was not successfully negotiated earlier.
 {¶ 38} In any event, Farley did move to suppress his incriminating statements, upon the ground that they were not voluntarily made. Following a hearing, Farley's motion to suppress was denied. Ultimately, he tendered a no-contest plea to the reduced charge of Attempted Gross Sexual Imposition, accompanied by a protestation of innocence, pursuant to North Carolina v. Alford, supra. His plea was accepted, and the trial court deferred the matter for sentencing.
 {¶ 39} At the conclusion of a sentencing hearing, Farley was sentenced to three years of community control, which included 30 days of jail, to be served intermittently on weekends. From his conviction and sentence, Farley appeals.
 II {¶ 40} Farley's First Assignment of Error is as follows:
 {¶ 41} "THE TRIAL COURT ERRED AND VIOLATED APPELLANT'S FOURTH [SIC] AMENDMENT RIGHTS WHEN IT REFUSED TO ORDER HIS STATEMENTS SUPPRESSED, BECAUSE THE EVIDENCE SHOWED THAT THOSE STATEMENTS WERE INVOLUNTARY."
 {¶ 42} Farley cites Colorado v. Connelly (1986), 479 U.S. 157, for the proposition that an involuntary statement made as the result of police coercion must be suppressed. He further cites State v. Edwards
(1976), 49 Ohio St.2d 31, second paragraph of the syllabus, for the proposition that some of the circumstances to be considered include the suspect's age, the suspect's mentality and prior criminal experience, the existence of physical deprivation or mistreatment, the length, intensity and frequency of the interrogation, and the existence of threat or inducement.
 {¶ 43} Essentially, Farley argues that he was coerced into giving incriminating statements because he was told that if he cooperated he would likely be dealt with more leniently, and because he was told that if he cooperated there would likely be less publicity.
 {¶ 44} In general, persons convicted of criminal offenses are dealt with more leniently when they have cooperated with the authorities. In Farley's case, he was found guilty of Attempted Gross Sexual Imposition, a felony of the fourth degree, for which he could have been sentenced to incarceration for six months, up to eighteen months. Furthermore, Farley was originally charged with Gross Sexual Imposition, with a victim less than thirteen years of age, a felony of the third degree. Had he not been offered an opportunity to pled guilty to a lesser offense, and had he been convicted of Gross Sexual Imposition, he could have been sentenced to a prison term of 1, 2, 3, 4 or 5 years. In fact, Farley received 3 years of community control, with thirty days of intermittent incarceration in jail, to be served during weekends. This is a far cry from the false promises of leniency that resulted in finding confessions to have been involuntary in State v. Arrington (1984),14 Ohio App.3d 111, and State v. Petitjean (2000), 140 Ohio App.3d 517. In both of those cases, a defendant was induced to admit his role in a killing upon representations that he would likely receive probation, or community control, even though that was not a realistic possibility in either case. In the case before us, by contrast, community control was not only a reasonable possibility, it was the actual sentence imposed, although it did include thirty days of intermittent confinement in jail.
 {¶ 45} In our view, the representations by detectives Lord and Shafer that Farley would more likely be dealt with leniently if he told the truth, were neither misleading nor unduly coercive.
 {¶ 46} Farley also argues that his will was overborne by the detectives' representations that he could avoid publicity by cooperating. Here, it appears that Farley's desire to avoid publicity may have been frustrated, the plea bargain not having been entered into until the eve of trial. However, there is nothing in the record to indicate who or what was responsible for the fact that a plea bargain was not negotiated earlier in the process. We find nothing inherently implausible in Shafer's statements to Farley that an early plea bargain could involve a plea to a bill of information that would avoid extensive publicity. Again, we find nothing misleading, or unduly coercive, about these representations.
 {¶ 47} In summary, after having reviewed the entire videotape of the interview, we conclude that Farley's will was not overborne, and that the trial court could find from, this evidence, that Farley's statements were voluntarily made.
 {¶ 48} Farley's First Assignment of Error is overruled.
 III {¶ 49} Farley's Second Assignment of Error is as follows:
 {¶ 50} "THE SENTENCE IMPOSED IN THIS CASE SHOULD BE REVERSED BECAUSE THE TRIAL COURT RELIED ON AN IMPROPER AGGRAVATING FACTOR."
 {¶ 51} In its sentencing entry, the trial court considered seriousness and recidivism factors, pursuant to R.C. 2929.12. The trial court found three factors "as to recidivism unlikely." These included the fact that Farley had not been adjudicated a delinquent, that he had no prior convictions, and that he had been law abiding for a significant number of years prior to the offense. The trial court found one factor "as to recidivism likely." This factor was that Farley "shows no remorse for the offense."
 {¶ 52} Farley contends that the trial court erred when it considered his lack of remorse as a factor in sentencing, because he had tendered his no-contest plea pursuant to North Carolina v.Alford, supra, which meant that he was protesting his innocence, while nevertheless pleading no contest. Therefore, Farley argues, he had nothing to be remorseful about.
 {¶ 53} We rejected this argument in State v. Bavendam (January 22, 1999), Miami App. Nos 98-CA-26 and 98-CA-27, which also involved a no-contest plea to a charge of Attempted Gross Sexual Imposition, accompanied by a protestation of innocence. We see no reason to reconsider State v. Bavendam, supra.
 {¶ 54} Farley argues that because his no-contest plea was an Alford plea, accompanied by a protestation of innocence, there was nothing for him to be remorseful about. That would be equally true of a defendant who has pled not guilty, and been convicted. Nevertheless, it is clear that lack of remorse is an appropriate consideration for sentencing, even for a convicted defendant who maintains his innocence.
 {¶ 55} Furthermore, in view of the sentence imposed in this case, which was three years of community control, including thirty days of intermittent confinement in jail, we consider it unlikely that the trial court gave Farley's lack of remorse much weight in imposing sentence.
 {¶ 56} Farley's Second Assignment of Error is overruled.
 IV {¶ 57} Both of Farley's assignments of error having been overruled, the judgment of the trial court is Affirmed.
WOLFF, P.J., and GRADY, J., concur.