OPINION.
In this multiple-issue appeal, we affirm the findings of guilt, but vacate the sentence and remand to the trial court for resentencing.
Appellant James Grant was charged with four counts of aggravated murder with death-penalty specifications, including a kidnapping and an aggravated-robbery specification attached to each count, one count of aggravated burglary, three counts of aggravated robbery, and four counts of kidnapping. Firearm specifications were also attached to each of the twelve counts. A jury found him guilty of four counts of involuntary manslaughter (a lesser-included offense of aggravated murder), one count of aggravated burglary, two counts of aggravated robbery, and three counts of kidnapping, as well as the accompanying gun specifications. He was acquitted of one count of aggravated robbery and one count of kidnapping. The trial court sentenced Grant to ten years for involuntary manslaughter, having merged the multiple counts for that offense, to three years on the gun specifications, and to ten years on each of the remaining counts. The court ordered the sentences to be served consecutively, for a total of seventy-three years.
Grant now appeals his convictions, raising seven assignments of error. His first two assignments raise sentencing errors. In those assignments, he contends that the trial court failed to comply with the statutory requirements for imposing maximum and consecutive sentences, and that his convictions for kidnapping and aggravated robbery should have been merged for sentencing purposes because they involved allied offenses of similar import. His remaining assignments concern alleged errors during trial. In his third assignment, Grant argues that he was denied a fair trial because of prosecutorial misconduct during discovery and closing argument. In his fourth assignment, Grant claims that his convictions for involuntary manslaughter and kidnapping were against the manifest weight of the evidence. Grant argues in his fifth assignment that the trial court erred by failing to exclude the testimony of witnesses who had allegedly violated the trial court's separation order. In his sixth assignment, Grant asserts that the trial court violated his Sixth Amendment right to a public trial by closing the courtroom. Last, Grant claims that the trial court erred by denying his motion to suppress his statements to the police because the statements were involuntary.
 I. The Murder of Antwaun Gilliam
Grant's convictions arose from the murder of Antwaun Gilliam and the robberies of Darrick Frazier and Steven Franklin. According to the testimony of Frazier, Gilliam, accompanied by Franklin, had called out to him from below the window of Frazier's girlfriend's apartment. Franklin wanted to buy two ounces of crack cocaine from Frazier. Frazier, Franklin, and Gilliam met at Lakesha Bryant's apartment, where Frazier resided, to complete the transaction. Having forgotten his key, Frazier knocked on the apartment door, and Bryant, who had been sleeping, let them in. She then returned to her bedroom.
Frazier entered the bedroom, went to a safe containing his cocaine, cut what he thought appeared to be two ounces, and brought it to the kitchen to weigh. (Apparently, Gilliam was not in the apartment at this time.) When Gilliam returned, Grant followed him, uninvited, through the door. Grant told Frazier that he wanted to buy $100 of crack cocaine. Frazier said that he did not have any cocaine for sale. Grant then instructed Angelo Fears to enter the apartment.
Grant put a gun in Frazier's face, grabbed him, and pushed him into a chair. When Frazier tried to run for the door, Grant stopped him. Grant then said, "Lay that shit down," to Gilliam, Frazier, and Franklin. Grant instructed Fears, "Kill one of them niggers." Fears asked which one and pointed his gun toward Gilliam and then toward Franklin. When Fears pointed his gun at Gilliam, Grant said, "Not him." Gilliam and Franklin lay on the floor. Frazier sat on a chair. The men begged Grant and Fears to spare their lives.
Grant took the two ounces of crack and demanded that Frazier remove his gun from his pocket. He also took Frazier's rings, a bracelet, and $280. When Frazier told Grant that he had no more cocaine, Grant struck him across the face with his gun. Grant then walked back to Bryant's children's bedroom in search of more drugs. At that point, Fears stuck a gun in Gilliam's buttocks and threatened to kill him. Grant came out of the bedroom, walked around Fears, and then made his way back to Bryant's bedroom. While Grant was in Bryant's bedroom, Fears shot Gilliam. Franklin escaped by jumping out a window.
Grant re-entered the room where the men were gathered and asked for whatever drugs remained in the apartment. Frazier took him to Bryant's room. Grant pushed Frazier onto the bed where Bryant was sitting and grabbed a bag containing twenty-eight ounces of crack cocaine. He then placed a gun in Frazier's face. After stating, "Nigger, I should kill you," Grant walked out the bedroom door. A few minutes later, Frazier yelled for someone to call the police.
According to Franklin's testimony, only he and Frazier had initially entered Bryant's apartment. Franklin had $2,000 with him to purchase two ounces of crack cocaine for $1,400. After Frazier brought a grocery bag from Bryant's back bedroom, they heard a knock on the door. Frazier opened the door and Gilliam entered, followed closely by Grant.
Grant asked for $100 in drugs, and Frazier agreed to sell it to him. But Grant pulled a gun, told the men to "lay it down," and directed them to lie on the floor. Fears then walked in with a gun. Fears patted down the men. Franklin dropped $2,000 on the floor, which Fears picked up. Franklin heard Grant say, "No, don't shoot him," or something similar, before Grant left the room. Franklin testified at trial that Grant had been directing Fears, and that Grant said to Fears, "[J]ust shoot him, and then he was like, no, don't shoot him." Franklin further testified that Grant then said, "Don't shoot none of them." In contrast, Franklin had previously told the police that Grant had said, "No, don't shoot him, shoot Franklin."
Bryant testified that Frazier lived with her and that they had a platonic relationship. On the night of the murder, Frazier knocked on her apartment door, and she opened the door to allow Frazier and Franklin to enter. Frazier retrieved his keys and his jacket and left, while Franklin remained behind. When Frazier returned, Bryant went back to her bedroom.
Bryant was soon awakened by voices. She heard someone say, "Lay down, give me everything." She then screamed, "Don't hurt my baby." She also heard someone say, "Let me see you back off on this motherfucker." She recognized Grant's voice in particular as he said, "Shoot that nigger." Subsequently, she heard the door to her child's room open and close, and she then saw Grant, whom she recognized, enter her room. The first thing he said was that everything was going to be all right. Grant asked whether she had called the police. When she replied that she had not, he removed the telephone from her room. He pointed his gun at her and said, "Shoot that nigger." She kept begging him not to hurt her baby. While Grant was in her bedroom, Bryant heard a gunshot.
After the gunshot, Grant left the bedroom. He returned with Frazier, pushed him onto the bed, held a gun to his head, and forced Frazier to open the safe. Bryant heard Grant tell Frazier that he should shoot him. Frazier begged him not to. Grant left the room and Frazier followed. A few minutes later, Bryant heard Frazier screaming that "they shot his nigger." Bryant called 911. Soon after the incident in Bryant's apartment, Bryant, Frazier, and Franklin each identified their assailants as Grant and Fears, men they knew from the neighborhood. All three victims testified that they were terrified during the incident.
Grant later provided several statements to the police. In his final statement, he admitted going into Bryant's apartment to rob Frazier. Fears had provided Grant with a gun. Upon entering the apartment, Grant and Fears ordered the men to lie on the floor. Grant pulled out his gun when Frazier panicked and pushed him. Grant stated that money and drugs were on the table, and that Franklin had thrown some money on the floor. Grant ordered Frazier to get the rest of the drugs and money. Grant followed Frazier to Bryant's bedroom, where Frazier removed a bag from the safe and Grant grabbed it.
Grant then heard a gunshot. Frazier ran for the door of the apartment, and Fears hit him. Fears and Grant left in a van Grant had borrowed. While Grant drove around, they split the money and the drugs. Grant threw his share of the money under a parked car and passed the drugs to a friend. Fears gave Grant the murder weapon, which Grant then gave to his uncle's friend. The friend gave the gun to Grant's uncle. It was recovered from a closet in the uncle's house.
Part of Grant's defense at trial was that he had been under the influence of alcohol and/or drugs when the murder occurred. Both Bryant and Frazier testified that Grant had appeared "high."
 II. Sentencing Errors A. Imposition of Maximum Consecutive Sentences
Grant claims in his first assignment that the trial court erred in imposing maximum consecutive sentences without complying with the statutory guidelines. We agree.
R.C. 2929.14(C) limits the imposition of a maximum sentence to the following types of offenders: (1) offenders who have committed the worst forms of the offense; (2) offenders who pose the greatest likelihood of recidivism; (3) certain major drug offenders; and (4) certain repeat violent offenders. The trial court determined on its felony-sentencing worksheet that Grant had committed the worst form of the offense and that he posed the greatest risk of recidivism. (The worksheet failed to indicate whether these findings related to any specific count or to all counts.) Those findings, standing alone, were not enough to justify a maximum sentence. The trial court also had the obligation to "give reasons supporting its finding before imposing the maximum term."[1]
The record is devoid of any reasons provided by the trial court to support its findings. Thus, the trial court failed to comply with the felony-sentencing statutes when imposing the maximum term on each of the counts. While there may very well have been sound reasons for maximum sentences, at least on some of the counts, the trial court was required to set them out specifically.
To impose consecutive sentences, the trial court was required under R.C. 2929.14(E)(4) to "find that consecutive sentences were necessary to protect the public from future crime or to punish [Grant], and that consecutive sentences were not disproportionate to the seriousness of the conduct and to the danger that [Grant] posed to the public."[2] The court was also required to find at least one of the following: "(1) the offender was awaiting trial or sentencing on another offense, was under community control, or was under post-release control; (2) the harm caused was great or unusual and that no single prison term would adequately reflect the seriousness of the offender's conduct; (3) the offender's history of criminal conduct demonstrated that consecutive sentences were necessary to protect the public from future crime by the offender."[3]
Just like the requirement for maximum terms, the trial court also had to provide its reasons for imposing consecutive sentences.[4] In its sentencing worksheet, the trial court indicated that the imposition of consecutive sentences was proper because the harm caused was great or unusual, and because consecutive sentences were necessary to fulfill the purposes of R.C. 2929.11, protection of the public from future crime or punishment of the offender. Again, it is unclear from the worksheet to which counts the court was referring.
At the sentencing hearing, before the sentences were actually imposed, the trial court stated, "It's my job as a judge to make sure that you create no more victims in the State of Ohio for as long a period as I can." After imposing consecutive sentences and holding a sidebar conference, the trial court further stated, "If it wasn't clear enough from my sentence I just gave Mr. Grant, I do find that the harm caused by his multiple offenses was so great or unusual that concurrent sentences would not adequately reflect the seriousness of his conduct." While this statement provided the requisite findings, the trial court failed to give the reasons for imposing consecutive sentences. "While it can be gleaned from the record that reasons might have existed for imposing consecutive terms, without a statement of those reasons from the trial court, we cannot say that the trial court fulfilled its statutory duty pursuant to R.C. 2929.19(B)(2)(c)."[5]
For all the foregoing reasons, we hold that the trial court erred in imposing consecutive maximum sentences for involuntary manslaughter, aggravated burglary, aggravated robbery, and kidnapping. (We see no error in ordering the sentence for the firearm specifications to be served consecutively or in merging the involuntary-manslaughter counts.) Grant's first assignment is accordingly sustained.
 B. Allied Offenses of Similar Import
In his second assignment, Grant argues that because his kidnapping and aggravated-robbery convictions relating to Frazier and Franklin involved allied offenses of similar import under R.C. 2941.25, the trial court erred by not merging those convictions for sentencing purposes. We agree in part.
The Ohio Supreme Court has implicitly addressed this assignment in the case of Grant's co-defendant, Angelo Fears. In State v. Fears,[6] the court determined whether Fears's kidnapping specification should have been merged with his aggravated-robbery specification. Fears had argued that, by failing to merge the specifications, the trial court had erroneously considered duplicative aggravating circumstances. The court agreed with Fears, relying on State v. Jenkins,[7] which had held that only aggravating circumstances involving allied offenses of similar import could be considered duplicative[8]:
 In Jenkins at 198, 15 OBR at 340, 473 N.E.2d 264 at 295, fn. 29, we stated that "implicit within every robbery (and aggravated robbery) is a kidnapping." Therefore, a kidnapping specification merges with an aggravated robbery specification unless the offenses were committed with a separate animus. R.C. 2941.25(B). Thus, when a kidnapping is committed during another crime, there exists no separate animus where the restraint or movement of the victim is merely incidental to the underlying crime. State v. Logan (1979), 60 Ohio St.2d 126, 14 O.O.3d 373, 397 N.E.2d 1345, syllabus. However, where the restraint is prolonged, the confinement is secretive, or the movement is substantial, there exists a separate animus as to each offense. Id.
As applied to this case, we find that the offenses of kidnapping and aggravated robbery were committed with no separate animus, as there is no showing of a prolonged restraint, significant asportation, or secret confinement of the victims. Therefore, we agree with appellant that the kidnapping specification merges with the aggravated robbery specification[9]
Thus, while we question what happened in Fears to the two-step analysis set forth in State v. Rance,[10] especially a comparison of elements of the offenses in the abstract, we are constrained by the court's analysis, which was based on facts identical to the ones in this case. It seems that the court has implicitly overruled Rance. Because Fears was decided after Rance, we must follow the later holding. Although Fears's claim involved the failure to merge specifications, as opposed to the primary offenses, the difference seems to be immaterial to the analysis employed.[11] Thus, we conclude that the kidnapping and aggravated-robbery convictions in this case involved allied offenses of similar import. But this conclusion does not end our analysis.
The Fears decision addressed the specifications attached to the aggravated murder charges on which Fears was convicted. In that respect, only one victim was involved. In our case, however, we must also consider whether a separate animus existed for each of the two victims — Frazier and Franklin.[12] We conclude that the kidnapping and aggravated robbery of Frazier were committed with a separate animus from the kidnapping and robbery of Franklin. Grant was aware of two separate victims, pistol-whipped Frazier and specifically sought him out for the purpose of stealing his drugs and money. Only money was taken from Franklin. Franklin's kidnapping involved merely restraint, while Frazier was moved in order to obtain the drugs. Franklin was the only victim not physically injured, and he was allowed to escape.
Thus, we conclude that the trial court erred in failing to merge Grant's convictions for (1) the aggravated robbery of Frazier, as charged in count seven, with the aggravated kidnapping of Frazier, as charged in count nine, and (2) the aggravated robbery of Franklin, as charged in count eight, with the kidnapping of Franklin, as charged in count eleven. The second assignment of error is accordingly sustained in part.
 III. Alleged Prosecutorial Misconduct A. Discovery Violations
In his third assignment, Grant claims that he was denied a fair trial because of prosecutorial misconduct. Grant first contends that the prosecutor violated the criminal rules of discovery by failing to turn over favorable impeachment evidence. Specifically, he asserts that one of the assistant prosecutors had known that Bryant was going to provide testimony different from what had been related in discovery. (What these specific differences were is not clear from the record.) Grant also alleges that the same assistant prosecutor withheld material evidence when he failed to inform Grant before trial that Frazier would testify that Grant had taken $2,000 of crack cocaine from him, and not the $2,000 in cash that the state had indicated in its discovery responses. After Frazier testified that Grant had taken the crack cocaine, the state conceded that that it had been told that Grant had stolen $21,000 in crack from Frazier a few days before Frazier's testimony.
Grant also claims that the state withheld material evidence, where discovery had indicated that Franklin had told the police that Fears had taken $200 from him, but Franklin later testified that the amount taken by Fears was $2,000. Franklin testified that he had told the assistant prosecutor a few days before trial that Fears had actually taken $2,000 from him.
Grant moved to dismiss the charges against him based upon the state's alleged misconduct. The trial court denied his motions.
Crim.R. 16(B)(1)(f) provides that a prosecutor has the duty to disclose all known evidence that is clearly exculpatory and material.[13]
Evidence is material when "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."[14] A "reasonable probability" has been defined as "a probability sufficient to undermine the confidence in the outcome."[15] Crim.R. 16(B)(1)(g), which governs a defendant's discovery of witness statements, provides that the defendant must move for an in camera inspection of a witness's recorded or written statement after direct examination of the witness. The purpose of the in camera
inspection is discern whether discrepancies exist between the witness's testimony and the prior statement. In this case, there is no allegation of a recorded or a written statement being withheld. In fact, defense counsel was able to use police reports and discovery responses to impeach testimony.
What is germane to this case is whether the prosecutor withheld clearly exculpatory and material evidence in violation of Crim.R. 16(B)(1)(f). If the trial court determines that a party has failed to comply with the discovery rules or orders, it has the discretion to make any order it deems just under the circumstances.[16]
Grant conceded at trial that the information suppressed by the state regarding Bryant's testimony was not "really that harmful." As to the discrepancies in Frazier's and Franklin's statements and their trial testimony, Grant's innocence was not dependent upon whether drugs or money were stolen, or whether $2,000 or $200 was stolen. Thus, the change in the details was not material in and of itself. The value of the evidence suppressed by the state allegedly resided in its impeachment capability. Upon learning of the discrepancies, Grant's counsel effectively used the inconsistencies to discredit the testimony of Frazier and Franklin and to raise questions about the tactics of the state. Therefore, we cannot conclude that had the contested evidence been disclosed before trial, the result of the trial would probably have been different. Resultantly, we hold that the trial court did not abuse its discretion in denying Grant's motion to dismiss the case.
 B. Closing Argument
Grant next claims that the assistant prosecutor made improper closing arguments. Grant contends that the assistant prosecutor vouched for Bryant's credibility by stating that he believed Bryant was telling the truth. He also argues that the assistant prosecutor referred to facts not in evidence when he (1) told the jury that Grant could not have been intoxicated because he was not stumbling, and because he could drive a van; (2) stated that Fears had asked Grant which person he should shoot (the trial court sustained Grant's objection to that statement), referred to Grant as "the boss," and attributed to Grant the words "kill that person"; and (3) misstated the law on transferred intent.
Our standard for determining "prosecutorial misconduct is whether the conduct complained of deprived the defendant of a fair trial."[17] To conclude that a defendant has received a fair trial, "it must be clear beyond a reasonable doubt that, absent [a] prosecutor's [improper] comments, the jury would have found the defendant guilty."[18] As servants of the law, prosecutors "must adhere to the highest standards" and "avoid improper arguments, insinuations, and assertions calculated to mislead the jury."[19] But, "[i]n the tension and turmoil of a trial, both the prosecution and the defense have wide latitude in summation as to what the evidence has shown and what reasonable inferences may be drawn therefrom."[20] The argument must be viewed as a whole and not in isolated parts.[21]
We must first determine whether the prosecutor's comments were improper. We conclude that it was improper for the prosecutor to comment on the credibility of Bryant's testimony by saying,[22]
 We heard from Lakesha Bryant, and Lakesha, in fairness I believe, was trying to live in difficult circumstances and I believe that she did tell you the truth. Her testimony had that ring of truth to it.
It is improper for a prosecutor to express personal opinions as to the credibility of witnesses because such assertions "are apt to carry great weight against the accused when they should properly carry none."[23]
Further, asserting a personal opinion as to the credibility of a witness is a violation of the Ohio Code of Professional Responsibility.[24]
It was also improper for the state to comment that Grant had not been intoxicated because he had not been stumbling, because there was no evidence in the record as to that fact. There was evidence, however, to indicate that Grant had successfully driven the van after the murder.
Grant also claims that there was no evidence to support the prosecutor's statement that Fears had actually asked Grant which person to shoot. But the objection to this statement was sustained by the trial court. Grant further claims that the prosecutor's references to Grant as "the boss" and his attribution of the phrase "kill that person" to Grant were improper. Obviously, the comments in question were not in evidence. What was in evidence, however, was that Grant had said, "Kill one of them niggers," to Fears, that Fears had pointed his gun at Gilliam, and that Grant had indicated that Franklin, not Gilliam, should be shot. This evidence provided an inference that Grant was directing Fears to some extent. Thus, while it was somewhat questionable, we cannot conclude that the prosecutor's reference to facts not in evidence violated Grant's right to a fair trial.
Grant also challenges the state's definition of transferred intent. The prosecutor described transferred intent as the shooting of a person behind an intended target who has ducked. He argued that there was no difference between his description of transferred intent and an episode in which a gunman shot the wrong person based upon a misunderstanding of instructions given by another. Grant objected to the alleged misstatements, but the trial court overruled the objection because "it's closing argument." We agree that "[i]t is improper for a prosecutor to misstate the law."[25] In this case, however, there was no improper misstatement. The evidence demonstrated that Grant had directed Fears to shoot Franklin. Fears, instead, shot Gilliam. Grant's mental culpability as it related to Franklin transferred to Gilliam.[26] Further, transferred intent was applicable only to the charges of aggravated murder and murder. Grant was acquitted of both those charges. Even if the prosecutor had misstated the law on this issue — which he did not — Grant could not have been prejudiced because the jury found him not guilty of the applicable charges.
Because the conduct of the prosecutor did not deprive Grant of a fair trial, we overrule his third assignment.
 IV. Weight and Sufficiency of the Evidence
In his fourth assignment, Grant contends that his convictions for involuntary manslaughter and kidnapping were against the weight of the evidence. A review of his supporting arguments demonstrates that while he is challenging the weight of the evidence supporting his conviction for involuntary manslaughter, he is otherwise challenging the sufficiency of the evidence supporting his kidnapping conviction. Our review of these arguments consists of two different standards, because weight of the evidence and sufficiency of the evidence are "both quantitatively and qualitatively different."[27] To reverse on a manifest-weight challenge, we must "review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine [that] the trier of fact clearly lost its way and created a manifest miscarriage of justice."[28] "Weight is not a question of mathematics, but depends on its effect in inducing belief."[29] We may exercise our power to reverse on the weight of the evidence only in exceptional cases because "the weight of the evidence and the credibility of witnesses are primarily for the trier of fact, and an appellate court should not substitute its judgment."[30] In contrast, "[t]o reverse a conviction for insufficient evidence, an appellate court, reviewing the evidence in the light most favorable to the prosecution, must conclude that no reasonable trier of fact could have found the defendant guilty."[31]
The main thrust of Grant's manifest-weight challenge is that the state's witnesses had credibility problems and contradicted each other. We first note that a jury is free to believe all, part, or none of any witness's testimony.[32] Grant was convicted of involuntary manslaughter. This required evidence that Grant had caused the death of Gilliam as a proximate result of his committing or attempting to commit a felony. In Ohio, "where a person, acting individually or in concert with another, sets in motion a sequence of events, the foreseeable consequences of which were known or should have been known to him at the time, he is criminally liable for the direct, proximate and reasonably inevitable consequences of death resulting from his original criminal act."[33] Grant and Fears entered Bryant's apartment with guns for the purpose of robbing Frazier. During the course of the robbery, Gilliam was killed. While there were some discrepancies in the witnesses' testimony as to whether Grant had directed Fears to kill someone or had recanted that direction, we do not believe that the jury lost its way in concluding that the commission of the aggravated robbery was the proximate cause of Gilliam's death. Grant and Fears committed an armed robbery. Death resulted. If anything, the jury was lenient in finding Grant guilty of only involuntary manslaughter.
With respect to the kidnapping conviction, the state had the burden to show that Grant, by force, threat, or deception, had removed Franklin, Frazier, and Gilliam from where they had been found or had restrained their liberty in order "to facilitate the commission of any felony or flight thereafter."[34] (We note that the trial court also instructed the jury on kidnapping under R.C. 2905.01(A)(3), which required proof of terrorizing or inflicting serious physical harm, but that Grant's indictment did not contain that charge. There was no objection to the charge, and the jury's verdict indicated that it had found him guilty of kidnapping as charged in the indictment.) To restrain means "to limit one's freedom of movement in any fashion for any period of time."[35]
It does not matter whether the victim is restrained in a particular manner, only that the victim is in the offender's power and beyond immediate help.[36] Further, merely compelling a victim to stay where he is constitutes restraint.[37]
The evidence here demonstrated that Grant had entered Bryant's apartment without permission, while Gilliam was attempting to close the door. Grant stated that he wanted to buy some drugs. Grant put a gun in Frazier's face. When Frazier attempted to leave, Grant pushed him into a chair. He then hit Frazier in the face with a gun. He held the gun on Frazier, Gilliam, and Franklin and ordered them to lie on the floor. Fears held a gun on Gilliam, Frazier, and Franklin, while Grant went to the back of the apartment. After Fears shot Gilliam, Grant took Frazier to the back bedroom to get Frazier's drugs. He pushed Frazier onto the bed. Frazier testified that he was "scared as hell." We conclude that when Grant entered Bryant's apartment and ordered everyone to lie on the floor, he restrained Frazier's, Franklin's, and Gilliam's liberties. The wielding of the gun demonstrated that the restraint came about by threat of force. Force was also demonstrated by Grant hitting Frazier in the face with the gun when Frazier disobeyed Grant's order by attempting to leave. The evidence, when construed in a light most favorable to the prosecution, demonstrated that Grant had restrained the liberties of the three men to facilitate his robberies of Frazier and Franklin. Thus, we hold that there was sufficient evidence to support Grants kidnapping conviction-though for purposes of sentencing the kidnapping and aggravated-robbery counts must be merged as they each apply to a particular victim.
 V. Violation of Separation Order
In his fifth assignment, Grant argues that the trial court erred by not excluding the testimony of two witnesses who had violated the court's separation order. The purpose of a separation order is to prevent a witness from hearing the testimony of other witnesses and from tailoring his or her testimony to comport with the other testimony.[38] "Thus, a spectator or a witness may not tell a prospective witness what has taken place in court if the judge has ordered separation of witnesses."[39]
The trial court has discretion to allow a witness who has violated a separation order to testify. "Exclusion of a witness is ordinarily a decision within the sound discretion of the trial court. However, where a court seeks to exclude a witness for violating a separation order, there must be a showing that the party calling the witness consented to, connived in, procured or had knowledge of the witness' disobedience."[40]
In this case, the trial court allowed the lack of separation to be explored on cross-examination. "Corrective measures open to the court when a separation order is violated include `permitting the transgression to reflect upon the witness's credibility.'"[41] Obviously, exploration of a violation on cross-examination allows the jury to reflect on the credibility of the witness, even where the witness denies that the transgression has occurred. Because there is no evidence here that the state consented to, connived in, procured, or had knowledge of the other witness's disobedience, we cannot say that the trial court abused its discretion in allowing the witness to testify.
 VI. Closing the Courtroom
In his sixth assignment, Grant challenges the trial court's closure of the courtroom. The record demonstrates that when the trial court indicated that it was considering closure due to disturbances and possible intimidation of the jury, counsel indicated that Grant had stated he had "absolutely zero problem" with excluding everyone but himself, the attorneys, and court personnel. Grant himself stated on the record that he was in agreement with clearing the courtroom. We conclude that the wholesale exclusion of the public from the courtroom was error. The record fails to demonstrate "an overriding interest to warrant closure of the courtroom."[42] Further, the trial court failed to consider alternatives to complete closure or to identify any of the troublemaking spectators within the courtroom.[43] At most, the record demonstrates that there was some disturbance in the hallway and some alleged discomfort on the part of a juror because a witness had looked at her when she left the courthouse.
Even so, we find no merit in this assignment because Grant invited the error of which he complains. The doctrine of invited error precludes a party from taking advantage of an error that the party has induced or invited.[44] Invited error occurs "when a party has asked the court to take some action later claimed to be erroneous, or affirmatively consented to a procedure the trial court proposed."[45] The record clearly indicates that Grant more than merely acquiesced to the trial court's proposal — he affirmatively consented to the procedure.
While the error in this case is not reversible error, we note that court proceedings are "presumptively open to everyone," and that not only do the parties have a right to an open courtroom, but the public also has the right "to see that justice is done."[46] Closing the courtroom, rather than excluding specific persons who are disrupting the proceedings, can seldom be justified. Were this more than an isolated occurrence, we would be forced to reverse in order to vindicate the public's right to access. Here, we balance the interest in finality and do not reverse the results of an otherwise fairly tried case. But we strongly caution trial courts to avoid this procedure, which would, in the absence of the defendant's acquiescence, require reversal. We overrule Grant's sixth assignment.
 VII. Voluntariness of Grant's Statements
In his seventh assignment, Grant alleges that his inculpatory statements were involuntary because they were induced by coercive promises, and because he was under the influence of drugs at the time.
Grant was interviewed three times by Cincinnati Police Officers Seal and Ventre on March 30, 1997, after Grant's arrest. The first interview began at 11:37 a.m. and lasted until 11:49 a.m., approximately twelv minutes. At that point, the tape recorder was turned off, but the officers continued to speak with Grant. At 12:06 p.m., the recorder was again turned on and a second interview was recorded for approximately six minutes. The police continued to talk with Grant for another two hours and sixteen minutes before they once again turned on the recorder for a third interview at 2:28 p.m. That session lasted eleven minutes. The next day, a fourth, partially recorded interview took place at the Hamilton County Justice Center at Grant's request. That interview was not fully recorded because the batteries in the recorder failed.
None of Grant's inculpatory statements were contained in the taped interviews. This is because the police officers shut off the recorder between each of the first three interviews, and because the recorder's batteries failed during the last interview. Better police practice would have been to record the entire interviews, because such "practice would both allow the detection of improper interrogations when they occurred and prevent unfounded allegations of impropriety when none exist[ed]."[47] The result would have been the more effective and efficient use of legal resources.
The state bears the burden of proving by a preponderance of the evidence that a defendant's statement is voluntary within the meaning of the Due Process Clause of the Fourteenth Amendment.[48] "[C]oercive police activity is a necessary predicate to the finding that a confession is not voluntary within the meaning of the Due Process Clause of the Fourteenth Amendment."[49] The trial court is the arbiter of questions of fact and the credibility of witnesses in deciding voluntariness issues at a suppression hearing.[50] Further, the determination of the voluntariness of a statement must be based upon "the totality of the circumstances, including the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of the interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement."[51] In order for Grant's claim of intoxication to have invalidated his statements, he must have demonstrated that drugs or alcohol had impaired his reasoning.[52] The record does not bear this out. There is nothing in his statements to indicate that his reasoning was impaired, and the officers testified that there were no indicia of impairment.
As to Grant's allegations of coercion, he argues that the police officers promised to help him if he confessed. One of the officers offered to tell the judge about Grant's cooperation if he chose to make a statement. Officer Ventre stated that Officer Seal told Grant that a statement from him could make the difference in whether he left prison as a young man or as an old man. Officer Seal denied making the statement. Officer Ventre explained the statement as one indicating that it would reflect better on Grant if he cooperated. The officers denied discussing the length of a possible sentence, but Officer Ventre did state that Grant might have been told that he had the possibility of a life sentence.
A suggestion of leniency does not invalidate a confession, but may be a factor bearing on whether the confession is voluntary.[53] Further, admonitions to tell the truth are neither threats nor promises.[54]
Similarly, "[p]romises that a defendant's cooperation will be considered in disposition of the case, or that a confession will be helpful, do not invalidate an otherwise legal confession."[55] Thus, "[t]he line to be drawn between permissible police conduct and conduct deemed to induce or tend to induce an involuntary statement does not depend upon the bare language of the inducement but rather upon the nature of the benefit to be derived by a defendant if he speaks the truth, as represented by the police."[56]
Based on the totality of the circumstances, we conclude that Grant's statements to the police were the product of free and deliberate choice, and not of coercive police activity. The interviews were not of exceptional length or intensity. Grant was familiar with the justice system. There was no evidence of physical deprivation or mistreatment. The comments by the police, while reflecting that Grant was in serious trouble, did not rise to the level of threats or inducements. Therefore, we overrule Grant's seventh assignment.
 VIII. Conclusion
We affirm the trial court's judgment as to the findings of guilt on all counts. We reverse the sentence in all respects except those relating to the specifications. We remand this case to the trial court with instructions (1) to resentence Grant on all counts, excluding the firearm specifications, after providing supporting reasons for appropriate statutory findings, (2) to merge, for purposes of sentencing, the kidnapping and aggravated-robbery counts pertaining to Frazier and (3) to merge, for purposes of sentencing, the kidnapping and aggravated-robbery counts pertaining to Franklin.
 __________________ Painter, Judge.
 Doan, P.J., and Hildebrandt, J., concur.
[1] See State v. Akins (Dec. 22, 2000), Hamilton App. Nos. C-000168, C-000169, and C-000170, unreported, citing R.C. 2929.19(B)(2)(d) and (e); State v. Edmonson (1999), 86 Ohio St.3d 324, 328-329, 715 N.E.2d 131,135.
[2] See id., citing R.C. 2929.14(E)(4).
[3] See id., citing R.C. 2929.14(E)(4)(a) through (c).
[4] See id., citing R.C. 2929.19(B)(2)(c) and State v. Edmonson,supra.
[5] See id.
[6] State v. Fears (1999), 86 Ohio St.3d 329, 344, 715 N.E.2d 136,151, certiorari denied (2000), 529 U.S. 1039, 120 S.Ct. 1535.
[7] State v. Jenkins (1984), 15 Ohio St.3d 164, 473 N.E.2d 264.
[8] Accord State v. Reynolds (1998), 80 Ohio St.3d 670, 682-683,687 N.E.2d 1358, 1371.
[9] See State v. Fears at 344, 715 N.E.2d at 151.
[10] State v. Rance (1999), 85 Ohio St.3d 632, 710 N.E.2d 699.
[11] See State v. Waddy (1992), 63 Ohio St.3d 424, 448, 588 N.E.2d 819,837. But, see, State v. Gregory (1993), 90 Ohio App.3d 124, 628 N.E.2d 86
(same act or transaction determination applicable to specification is not made in reference to separate-animus test); State v. Inglesias-Rodriquez
(Mar. 16, 2000), Cuyahoga App. No. 76028, unreported.
[12] Accord State v. Gillis (Apr. 28, 2000), Hamilton App. No. C-990709, unreported; State v. Raheem (Sept. 18, 1990), Hamilton App. No. C-970928, unreported.
[13] State v. Lane (1995), 108 Ohio App.3d 477, 484, 671 N.E.2d 272,277.
[14] Id. at 484, 671 N.E.2d at 277, quoting United States v. Bagley
(1985), 473 U.S. 667, 682, 105 S.Ct. 3375, 3383.
[15] See State v. Johnston (1988), 39 Ohio St.3d 48, 529 N.E.2d 898,901, paragraph five of the syllabus.
[16] See Crim.R. 16(E)(3).
[17] State v. Fears at 332, 715 N.E.2d at 143.
[18] See State v. Smith (1984), 14 Ohio St.3d 13, 15, 470 N.E.2d 883,886.
[19] See State v. Fears at 351, 715 N.E.2d at 156 (Moyer, C.J., concurring in part and dissenting in part).
[20] See State v. Lott (1990), 51 Ohio St.3d 160, 165, 555 N.E.2d 293,300, quoting State v. Stephens (1970), 24 Ohio St.2d 76, 82,263 N.E.2d 773, 777.
[21] State v. Moritz (1980), 63 Ohio St.2d 150, 157-158, 407 N.E.2d 1268,1273.
[22] See State v. Smith at 14, 470 N.E.2d at 885.
[23] See State v. Smith at 15, 470 N.E.2d at 886.
[24] See DR 7-106(C)(4).
[25] State v. McManus (Nov. 1, 1984), Cuyahoga App. No. 48118, unreported.
[26] Accord State v. Black (Feb. 25, 1999), Mahoning App. No. 95 CA 7, unreported.
[27] See State v. Thompkins (1997), 78 Ohio St.3d 380, 386,678 N.E.2d 541, 546.
[28] See State v. Pies (Dec. 17, 1999), Hamilton App. Nos. C-990241 and C-990242, unreported, citing State v. Martin (1983), 20 Ohio App.3d 172,175, 485 N.E.2d 717, 720.
[29] See State v. Thompkins at 387, 678 N.E.2d at 546, quoting Black's Law Dictionary (6 Ed. 1990) 1594.
[30] See State v. Sorrels (1991), 71 Ohio App.3d 162, 166,593 N.E.2d 313, 315.
[31] See State v. Pies, supra, citing State v. Jenks (1991),61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus.
[32] See State v. Antill (1964), 176 Ohio St. 61, 197 N.E.2d 548.
[33] See State v. Chambers (1977), 53 Ohio App.2d 266, 373 N.E.2d 393,394.
[34] R.C. 2905.01(A)(2).
[35] See State v. Wingfield (Mar. 7, 1996), Cuyahoga App. No. 69229, unreported; State v. Walker (Sept. 2, 1998), Medina App. No. 2750-M, unreported; State v. Wilson (Nov. 2, 2000), Franklin App. No. 99AP-1259, unreported.
[36] See State v. Wilson (Nov. 2, 2000), Franklin App. No. 99AP-1259, unreported, quoting 1974 Committee Comment to R.C. 2905.01.
[37] See id.
[38] See State v. Waddy, 63 Ohio St.3d at 434, 588 N.E.2d at 828.
[39] See State v. Waddy at 434, 588 N.E.2d at 828.
[40] See State v. Smith (1990), 49 Ohio St.3d 137, 142, 551 N.E.2d 190,195.
[41] See State v. Franklin (1991), 62 Ohio St.3d 118, 127, 580 N.E.2d 1,9, quoting 1 Weissenberger's Ohio Evidence (1990) 91, Section 615.3.
[42] See State v. Clifford (1999), 135 Ohio App.3d 207, 213,733 N.E.2d 621, 625.
[43] See id.
[44] See State v. Campbell (2000), 90 Ohio St.3d 320, 324,738 N.E.2d 1178, 1188.
[45] See id.
[46] See State v. Clifford at 215, 733 N.E.2d at 626 (Painter, J., concurring).
[47] See State v. Hughbanks (Dec. 3, 1998), Hamilton App. No. C-980595, unreported.
[48] See State v. Cedeno (Oct. 23, 1998), Hamilton App. No. C-970465, unreported, citing Lego v. Twomey (1972), 404 U.S. 477, 489,92 S.Ct. 619, 627.
[49] Colorado v. Connelly (1986), 479 U.S. 157, 167,107 S.Ct. 515, 522.
[50] See State v. Carter (1995), 72 Ohio St.3d 545, 651 N.E.2d 965.
[51] See State v. Edwards (1976), 49 Ohio St.2d 31, 358 N.E.2d 1051, paragraph two of the syllabus, vacated in part on other grounds (1978),438 U.S. 911, 98 S.Ct. 3147.
[52] See State v. Israel (Sept. 26, 1997), Hamilton App. No. C-961006, unreported, citing State v. Stewart (1991), 75 Ohio App.3d 141,598 N.E.2d 1275.
[53] See State v. Wilson (1996), 117 Ohio App.3d 290, 294,690 N.E.2d 574, 577.
[54] See id.
[55] See id.
[56] See State v. Arrington (1984), 14 Ohio App.3d 111, 115,470 N.E.2d 211, 216, quoting People v. Flores (1983), 144 Cal.App.3d 459,469, 192 Cal.Rptr. 772, 776-777.